UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-60064-CR-ZLOCH

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                             **FINAL ORDER OF DISMISSAL**

EDWARD MYERS,

        Defendant.

_____/

     THIS MATTER is before the Court upon Defendant Edward Myers's Motion To Dismiss Indictment (DE 18).  The Court has carefully reviewed said Motion and the entire court file and is otherwise fully advised in the premises.

     Defendant Edward Myers is charged in a one-count Indictment (DE 7) with failure to comply with the registration requirements of the Sex Offender Registration and Notification Act, 42 U.S.C. §§ 16901, et seq. & 18 U.S.C. § 2250 (2006) (hereinafter "SORNA").  He seeks to dismiss the Indictment on several grounds, the most compelling of which is that both § 2250 and the registration requirements found at § 16913 exceed Congress's Commerce Clause power and are therefore unconstitutional.[1]

     This Order centers upon the constitutionality of two statutes

_____

    [1] Many courts and commentators, especially in the passages quoted herein, render the possessive of "Congress" as "Congress'." For clarity as to the number of congresses being referred to and staying faithful to the traditional rules of grammar, the Court will employ the natural construction "Congress's" when referring to the possessive singular of our national legislature.  See William Strunk, Jr. and E.B. White, The Elements of Style 1 (4th ed. 2000).

within the Adam Walsh Act.  The thrust of the discussion centers on Congress's Commerce Clause power, where the intricacies of the law are divorced from any value judgment as to whether and how society should protect itself from sex offenders.  Sex offenders have undermined the decency once assumed in our fellow man and made us think twice before sending our children and grandchildren outside for a day of carefree play; they have paralyzed our families with fear.  The crimes the Adam Walsh Act is meant to prevent are among the most heinous anyone can imagine.  To that end, no lawful measure is too great and few punishments are too severe to protect society from sex offenders.  While this sentiment reflects the undersigned's personal feelings on the matter, it does not alter Congress's inability to bring about a manifold good through means it has been denied by the Founding Fathers.  See <u>United States v. Keller</u>, 213 U.S. 138, 144 (1909).

## I. <u>Background</u>

In response to the growing incidences of convicted sex offenders perpetrating further sexual assaults, particularly against minors, Congress passed the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act, Pub. L. 103-322, Title XVII §§ 170101, <u>et seq.</u>, 108 Stat. 2038 (1994) (codified as amended at 42 U.S.C. §§ 14071, <u>et seq.</u>).  It was passed as a federal funding statute that conditioned "federal law-enforcement funding on [each] state's adoption of sex offender registration laws and set minimum standards for state programs."

<u>Smith v. Doe</u>, 538 U.S. 84, 89-90 (2003).  These programs became commonly known as Megan's Laws and were enacted on a state-by-state basis.  <u>Id.</u> at 89.  The Jacob Wetterling Act and its later amendments did not impose federal criminal liability on individuals who violated a state's Megan's Law.  The punishment was left to the states.  42 U.S.C. § 14071(d) (2006).

Over the decade that followed passage of the Jacob Wetterling Act, crimes against minors became increasingly heinous and prevalent, and in response, Congress passed the Adam Walsh Child Protection and Safety Act of 2006, Pub. L. 109-248, 120 Stat. 587 (2006) (codified as amended in scattered sections of 18 & 42 U.S.C.) (hereinafter "Adam Walsh Act").  The Adam Walsh Act is a comprehensive statute, broken into seven Titles with each addressed to a different form of sexual exploitation and violent crime involving children.  Title I is the Sex Offender Registration and Notification Act, commonly known as SORNA.[2]  Two sections of SORNA are at issue in this Order: Pub. L. 109-248, §§ 113 and 141(a)(1) (codified at 42 U.S.C. § 16913 and 18 U.S.C. § 2250, respectively).  Section 16913 outlines the registration requirements for those individuals considered sex offenders.[3]  Section 2250 gives these

---

[2] Other than the brief mention made <u>infra</u> in this Order, the remaining Titles of the Adam Walsh Act (Titles II-VII) are immaterial to the issues addressed herein.

[3] Section 16913 provides, in relevant part, as follows:
(a) In general.  A sex offender shall register, and keep the registration current, in each jurisdiction where the offender resides, where the offender is an employee, and where the offender

requirements teeth by imposing criminal liability on sex offenders who travel in interstate commerce and knowingly fail to register or update their registration.[4]

By enacting SORNA, Congress sought to establish a national sex offender registry that would aid local law enforcement in its effort to protect the public from sex offenders.   42 U.S.C. § 16901.   It is structured to achieve this objective in two ways. First, it aims to increase the effectiveness of state sex-offender registries by eliminating the loopholes that accompany each state having its own unique registry system, 72 Fed. Reg. 8894-01 (Feb.

_____

is a student.  For initial registration purposes only, a sex offender shall also register in the jurisdiction in which convicted if such jurisdiction is different from the jurisdiction of residence.

.  .  .  .

(c) Keeping the registration current. A sex offender shall, not later than 3 business days after each change of name, residence, employment, or student status, appear in person in at least 1 jurisdiction involved pursuant to subsection (a) of this section and inform that jurisdiction of all changes in the information required for that offender in the sex offender registry.
42 U.S.C. § 16913.

[4] Section 2250 provides, in relevant part, as follows:
Whoever:
(1) is required to register under [SORNA];
(2) (A) . . . .
(B) travels in interstate or foreign commerce, or enters or leaves or resides in, Indian country; and
(3) knowingly fails to register or update a registration as required by [SORNA];
shall be fined under this title or imprisoned not more than 10 years, or both.
18 U.S.C. § 2250(a).

4

28, 2007), and replacing them with a single comprehensive system of federal registration requirements.  42 U.S.C. §§ 16912(a), 16914, et seq.  Second, SORNA creates incentives and disincentives for those states that do not "substantially comply" with the same.  Id. §§ 16925-16926.

In this action, the Indictment alleges that between February 2, 2008, and March 10, 2008, Defendant traveled in interstate commerce and did knowingly fail, in violation of § 2250, to update his registration as required by § 16913.  Defendant maintains that neither statute can be sustained under Congress's Commerce Clause power.  Specifically, he argues that Congress lacks the power to require all sex offenders to register under § 16913 and that § 2250 constitutes an impermissible attempt on the part of Congress to exercise police power reserved to the States.  The Government rejoins, generally, that §§ 16913 and 2250 are licit exercises of Congress's authority over persons in interstate commerce.

Since SORNA was signed into law, many defendants have challenged various provisions as unconstitutional.  Among the arguments raised in these challenges is that Congress exceeded its authority under the Commerce Clause when it enacted SORNA, particularly §§ 16913 and 2250.  At this time, one appellate court and over eighty district courts have addressed Congress's authority to enact those provisions under its Commerce Clause power.  See, e.g., United States v. May, 535 F.3d 912, 921-22 (8th Cir. July 31, 2008) (upholding SORNA as constitutional); United States v. Mason,

510 F. Supp. 2d 923, 931 (M.D. Fla. 2007) (same); George L. Blum, Annotation, Validity, Construction, and Application of Federal Sex Offender Registration and Notification Act (SORNA), 30 A.L.R. Fed. 2d 213, § 18 (2008) (collecting cases) (hereinafter "Blum, Validity of SORNA").  With the exception of three district courts, every court to consider the constitutionality of these provisions has found them a permissible exercise of congressional power.  E.g., Blum, Validity of SORNA, supra § 17.

The courts sustaining challenges to these provisions have differed in their reasoning.  For example, in United States v. Powers, the district court found that § 2250 did not regulate an activity that substantially affects interstate commerce, and thus was beyond Congress's commerce power.  544 F. Supp. 2d 1331, 1135 (M.D. Fla. April 18, 2008).  In United States v. Waybright, the court found that § 2250 was constitutionally licit as a regulation of "persons in interstate commerce," but found that the registration requirement at § 16913, which § 2250 relies upon, exceeded Congress's power under the Commerce Clause.  561 F. Supp. 2d 1154, 1163-64 (D. Mont. June 11, 2008); see also United States v. Guzman, ___ F. Supp. 2d ___; 2008 WL 4601446 (N.D.N.Y. Oct. 17, 2008) (holding the same).

Against the great weight of persuasive authority on this matter, and for reasons other than those expressed in Powers and Waybright, the Court finds that both § 16913 and § 2250 exceed Congress's grant of authority under the Commerce Clause.

6

Specifically, § 16913 is a universal regulation of certain persons without any regard for their place or participation in interstate commerce, and it is not part of an overlying economic scheme, the regulation of which Congress could reasonably anticipate would affect interstate commerce.  Contrary to <u>Powers</u>, the Court finds that by enacting § 2250 Congress did not attempt to regulate an activity that substantially affects interstate commerce.  Rather, the statute's language regulates sex offenders who have traveled in interstate commerce.  <u>Congress, however, has no power to regulate a person simply because at some earlier time he has traveled in interstate commerce</u>.  Therefore, as more fully detailed below, the Court will grant the instant Motion To Dismiss Indictment (DE 18), and Defendant Edward Myers shall go hence without day.

## II. <u>Standard of Review</u>

Defendant brought this Motion under Federal Rule of Criminal Procedure 12, which provides that "at any time while the case is pending, the court may hear a claim that the indictment . . . fails to invoke the court's jurisdiction or to state an offense."  Fed. R. Crim. P. 12(b)(3)(B).  This includes a claim that the statute creating the offense is unconstitutional.  <u>United States v. Seuss</u>, 474 F.2d 385, 387 n.2 (1st Cir. 1973) (citation omitted). Distilled to its essence, the Court's analysis is simply a matter of determining whether the laws Defendant is charged with violating are unconstitutional.  If they are, then the Indictment must be dismissed.  <u>In re Civil Rights Cases</u>, 109 U.S. 3, 8-9 (1883) ("It

is obvious that the primary and important question in all the cases is the constitutionality of the law; for if the law is unconstitutional none of the prosecutions can stand.").

### III. Background: The Commerce Clause

Before turning to the question of whether Congress has the power to enact the statutes at issue, the Court must first clearly define the power that Congress has historically had and to this day enjoys over interstate commerce.  The history recounted in this Section may at first appear superfluous.  However, it is only a careful reading of the precise issues, holdings, and language of the cases discussed below that leads the Court to the conclusion it reaches today--one in opposition to many other federal courts.  The import and holdings of the relevant caselaw are too often ignored by courts looking to sum up the issues of federalism present in the seminal cases with a mere parenthetical; such prooftexting does little to fulfill the duties of this Nation's federal courts.  See Brannon P. Denning and Glenn H. Reynolds, Rulings and Resistance: The New Commerce Clause Jurisprudence Encounters the Lower Courts, 55 Ark. L. Rev. 1253, 1263-65 (2003).  The need for a careful analysis of Congress's Commerce Clause power as it pertains to the issues raised by SORNA is confounded by the near summary dismissals many courts have given the arguments raised in opposition to its constitutionality.[5]

---

[5] Corey Rayburn Yung, One of These Laws is Not Like the Others: Why the Federal Sex Offender Registration and Notification

The original criminal laws passed by Congress were enacted either to effect Congress's enumerated powers under the Constitution or through its explicit authority to criminalize certain conduct.  The former category includes treason and interfering with the mail, <u>McCullough v. Maryland</u>, 17 U.S. (4 Wheat.) 316, 416-17 (1819), while the latter includes, for example, the power to criminalize counterfeiting and certain maritime offenses like piracy.  U.S. Const. art I, § 8, cl. 6, 10.  Congress's ability to enact the former category of criminal prohibitions was seen as incidental to its enumerated power to regulate and act in those fields.  <u>McCullough</u>, 17 U.S. (4 Wheat.) at 417.  Today, these original criminal statutes and later amendments make up a relatively small component of the overall federal criminal code, with most of the statutes being passed under the Commerce Clause.  Adam H. Kurland, <u>First Principles of American Federalism and the Nature of Federal Criminal Regulation</u>, 45 Emory L.J. 1, 1-15 (1996).

A. <u>The Precedent</u>

Any study of a constitutional question must begin with the text.  The federal Constitution grants Congress the exclusive power "[t]o regulate commerce with foreign nations, and among the several

_____

<u>Act Raises New Constitutional Questions</u>, 46 Harv. J. on Legis. (forthcoming 2009), <u>available at</u> http://ssrn.com/abstract=1193871 (discussing the lack of critical analysis courts have given to SORNA, and persuasively raising many of the objections addressed in this Order) (hereinafter "Yung, <u>One of These Laws is Not Like the Others</u>).

states, and with the Indian tribes." U.S. Const. art I, § 8, cl. 3. The study of Congress's power to regulate commerce among the several states quickly drifts from the Clause's text to its treatment in Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1 (1824).

In Gibbons, the Court's analysis of the Commerce Clause focused on the context of its adoption and the breadth of authority it granted Congress. First, the Commerce Clause served to cure a major flaw of the Articles of Confederation: the inability of the national government to coordinate trade and commerce among the states. Id. at 183-89, 192-96; see also Robert H. Bork and Daniel E. Troy, Locating the Boundaries: The Scope of Congress's Power To Regulate Commerce, 25 Harv. J.L. & Pub. Pol'y 849, 855-60 (2002). Second, the Commerce Clause did not effect a total grant of power to Congress, but a particular form of authority over commerce: "Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations . . . ." Gibbons, 22 U.S. (9 Wheat.) at 189-90. To the extent this commercial intercourse takes place between the states, Congress may regulate it. This power to regulate, however, does not extend to commerce that "is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States." Id. at 194. Based on the natural limits of the power entrusted to Congress in the Clause's text, the Court observed that "[t]he enumeration presupposes something not

10

enumerated; and that something, if we regard the language, or the subject of the sentence, must be the exclusively internal commerce of a State."  Id. at 195.

Over fifty years after Gibbons, Congress passed the Anti-Lottery Act of 1895, ch. 191, 28 Stat. 963 (1895) (codified as amended at 18 U.S.C. §§ 1301-1302), which prohibited the carrying of lottery tickets across state lines.  The statute was challenged in Champion v. Ames (The Lottery Case), 188 U.S. 321 (1903), and the Court upheld the prohibition as a permissible use of Congress's Commerce Clause power.  Id. at 354.  In The Lottery Case, the Court looked to the construction given the Commerce Clause in Gibbons and held that Congress's authority over commerce includes the power to free the channels of interstate commerce from articles it deems harmful.  Id. at 362 (noting "Congress may arbitrarily exclude from commerce among the states any article, commodity, or thing, of whatever kind or nature, or however useful or valuable").  This included the power to prohibit the carrying of lottery tickets in interstate commerce.  Id. (noting that "in order to suppress lotteries carried on through interstate commerce, Congress may exclude lottery tickets from such commerce").

In The Lottery Case, the Court's reasoning centered on the fact that Congress could not directly legislate against lottery tickets in all states and at all times.  But it was well within its power to proscribe the travel or transportation of lottery tickets across state lines.  Id.; James Clark Distilling Co. v. W. Md. Ry.

11

Co., 242 U.S. 311, 326-27 (1917) (employing the same reasoning to sustain Congress's power to prohibit the shipment of intoxicants into a state in violation of state law); see also Hipolite Egg Co. v. United States, 220 U.S. 45, 58 (1911) (referring to such articles as "outlaws of commerce").   In that way it defeats the evil attached to the lottery tickets.   Thus when Congress regulates the channels of interstate commerce, it is not regulating the local activity attached to it, but the travel of some article or person between state lines.

This principle was prominently applied in cases upholding the White Slave Traffic (Mann) Act, ch. 395, 36 Stat. 825 (1910) (codified as amended at 18 U.S.C. §§ 2421-2424), which made it unlawful to bring an underage woman across state lines to engage in certain immoral activities.   Hoke v. United States, 227 U.S. 308 (1913) (prostitution); Athanasaw v. United States, 227 U.S. 326 (1913) (debauchery); Caminetti v. United States, 242 U.S. 470 (1917) (concubinage).   In Hoke, the Supreme Court held that "if the facility of interstate transportation can be taken away from the demoralization of lotteries, the debasement of obscene literature, the contagion of diseased cattle or persons, the impurity of food and drugs, the like facility can be taken away from the systematic enticement to and the enslavement in prostitution and debauchery of women."   Hoke, 227 U.S. at 322 (discussing United States v. Popper, 98 Fed. 423 (N.D. Cal. 1899); The Lottery Case, 188 U.S. at 357; Reid v. Colorado, 187 U.S. 137 (1902)).   The focus in Hoke, like

12

the cases it cited, was not on the ability of Congress to regulate the local activity that took place once the person ceased traveling in interstate commerce. Instead, it relied on Congress's power to regulate the person's use of the channels of interstate commerce by forbidding such travel with the proscribed purpose or intent. <u>Id.</u> at 321-22; <u>see also</u> <u>Caminetti</u>, 242 U.S. at 491 (noting this act "<u>seeks to reach and punish the movement in interstate commerce</u> of women and girls with a view to the accomplishment of the unlawful purposes prohibited") (emphasis added); <u>Hoke</u>, 227 U.S. at 323 ("It may be that Congress could not prohibit in all of its conditions its sale within a state. <u>But Congress may prohibit its transportation between the states</u>, and by that means defeat the motive and evils of its manufacture.") (emphasis added).

As automobiles became prevalent in American society, their use frustrated the states' suppression of local crime. Tracy W. Resch, <u>The Scope of Federal Criminal Jurisdiction Under the Commerce Clause</u>, 1972 U. Ill. L. Rev. 805, 806. In response, Congress passed several statutes that criminalized traveling in interstate commerce to commit certain acts: the National Motor Vehicle Theft Act, 18 U.S.C. §§ 10, 2311-2313 (making it a crime to travel in interstate commerce with a stolen vehicle), the Federal Kidnapping Act, 18 U.S.C. §§ 1201-1202 (making it a crime to bring a victim of kidnapping across state lines), the Fugitive Felon Act, 18 U.S.C. § 1073 (making it a crime to travel in interstate commerce with the intent to avoid prosecution),, and the National Stolen Property

Act, 18 U.S.C. §§ 2311, 2314-2315 (making it a crime to travel in interstate commerce with stolen property); 18 U.S.C. § 1231 (traveling in interstate commerce to engage in strikebreaking). In each of these statutes, the person's travel across state lines with the particular intent or object is what Congress sought to regulate.

By criminalizing the use of the channels of interstate commerce to facilitate these crimes, Congress was faithful to its powers described in Gibbons as concerning "intercourse between the states." 22 U.S. (9 Wheat.) at 193-94. In upholding the National Motor Vehicle Theft Act, the Supreme Court reasoned that "Congress can certainly regulate interstate commerce to the extent of forbidding and punishing the use of such commerce as an agency to promote immorality, dishonesty or the spread of any evil or harm to the people of other states from the state of origin." Brooks v. United States, 267 U.S. 432, 437 (1925) (citing and discussing The Lottery Case, 188 U.S. at 358; Hoke, 227 U.S. at 323; Caminetti, 242 U.S. at 486). By prohibiting this use of the channels of interstate commerce, the Court reasoned, "[Congress] is merely exercising the police power, for the benefit of the public, within the field of interstate commerce." Id. (emphasis added) (citing Gloucester Ferry Co. v. Pennsylvania, 114 U.S. 196, 215 (1885)); see also Ky. Whip & Collar Co. v. Ill. Cent. R.R. Co., 299 U.S. 334, 347 (1937) (holding the same, even when the person or thing so regulated appears to be innocuous).

In the 1920s and 30s, large criminal syndicates began wreaking havoc on American society, and Congress responded accordingly. Harry S. Toy & Edmund E. Shepard, The Problem of Fugitive Felons and Witnesses, 1 Law & Contemp. Prob. 415, 415 (1934). Congress passed the Anti-Extortion Act of 1934, ch. 300, 48 Stat. 781 (1934) (codified as amended and revised at 18 U.S.C. § 875), and the Anti-Racketeering Act of 1934, ch. 569, 48 Stat. 979 (1934) (current version at 18 U.S.C. § 1951), to address the then-growing problem of organized crime in America.  A Note on the Racketeering, Bank Robbery, and "Kick-Back" Laws, 1 Law & Contemp. Prob. 445, 446-48 (1934); see also United States v. Pennell, 144 F. Supp. 317, 318-19 (N.D. Cal. 1956) (noting the history and revisions to the Anti-Extortion Act).  The Anti-Racketeering Act of 1934 differed significantly from the Mann Act and the National Motor Vehicle Theft Act, to name two examples.  Where previously Congress criminalized the travel of persons or things through the use of the channels of interstate commerce, this statute went a step further and reached the full extent of Congress's power under the Commerce Clause.  It criminalized the commission of certain delineated acts that were "in connection with or in relation to any act in any way or in any degree affecting trade or commerce or any article or commodity moving or about to move in trade or commerce."  United States v. Local 807 of Int'l Bhd. of Teamsters, 315 U.S. 521, 524 (1942) (quoting 18 U.S.C. § 420(a) (1940)).

The subtle difference in the Anti-Racketeering Act's text from

merely regulating persons or things "in interstate commerce" to regulating activities "affecting commerce" is profound. Federal law enforcement was no longer confined to combating crimes that abused the channels and instrumentalities of interstate commerce or were within the exclusive purview of Congress. Instead, the criminal conduct could be of a local nature, and all the government had to establish was "that the extortion or the conspiracy to extort be of such a nature that it affects interstate commerce in some degree." United States v. Malinsky, 19 F.R.D. 426, 428 (S.D.N.Y. 1956). Thus, federal law enforcement agents began to aid the states in the suppression of local crime if the same affected interstate commerce "in any way or degree." Id. (quotation omitted). Although the Anti-Racketeering Act was later amended into its present form, commonly referred to as the Hobbs Act, the ability of Congress to criminalize conduct merely "affecting commerce" under the Act was sustained in Sitrone v. United States, 361 U.S. 212, 218-19 (1960).

At the time these acts were passed, Congress had already extended its Commerce Clause power to regulate activities that substantially affect interstate commerce in commercial regulations. See N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U.S. 1 (1937); Wickard v. Filburn, 317 U.S. 111 (1942). However, the Anti-Racketeering Act marked the first time that Congress used its power over activities that affect interstate commerce to punish crime. See A Note on the Racketeering, Bank Robbery, and "Kick-Back" Laws,

16

supra at 447.  With the Supreme Court's approval of the broad power
to regulate conduct that affected interstate commerce, Congress was
no longer moored to the literal limits sketched in Gibbons for
congressional enactments.   Now, Congress began using its power
under the Necessary and Proper Clause with the Commerce Clause to
implement criminal regulations.  See Gonzalez v. Raich, 545 U.S. 1,
34 (2005) (Scalia, J., concurring in the judgment) ("Congress's
regulatory authority over intrastate activities that are not
themselves part of interstate commerce (including activities that
have a substantial effect on interstate commerce) derives from the
Necessary and Proper Clause.").   The decades that followed the
Anti-Racketeering Act brought further and further federal
regulation over criminal activities.   Note, The Proposed Federal
Criminal Code: An Unwarranted Expansion in Federal Criminal
Jurisdiction, 39 Oh. St. L.J. 132, 141-156 (1978).  With this
expanding Federal regulation, Congress increasingly invoked its
power to criminalize activities that are not simply "in commerce"
but those that affect interstate commerce.[6]

---

[6] E.g., 18 U.S.C. § 24(b) (Federal health care offenses
contemplating any act "affecting commerce"); 18 U.S.C. § 38(a)
(fraud involving aircraft and space vehicle parts in or affecting
interstate commerce); 18 U.S.C. § 175 (receipt of biological
weapons in or affecting interstate commerce); 18 U.S.C. § 245(b)(3)
(intimidation under the color of law of a business affecting
interstate commerce); 18 U.S.C. § 842 (manufacture and distribution
of explosive materials affecting interstate commerce); 18 U.S.C. §§
1030, 1037 (fraud or false statements affecting intestate
commerce); 18 U.S.C. § 1531(a) (prohibiting a physician from taking
the life of an innocent child by performing the monstrous act known
as partial-birth abortion in or affecting interstate commerce); 18

In the early 1950s, Congress sought to stem the flow of revenue from legal and illegal gambling proceeds to organized crime in America.  To aid law enforcement in this fight, Congress passed the Johnson Act, ch. 1194, 64 Stat. 1134 (1951), (codified at 15 U.S.C. §§ 1171-1177).  Under the Johnson Act, dealers and holders of gambling devices had to register with the Attorney General regardless of whether the devices were shipped in interstate commerce, or the dealer engaged in or affected interstate commerce. When the statute was challenged, the Government maintained that "the statute, literally read, reaches all dealers and transactions and the possession of all unreported devices without reference to interstate commerce." United States v. Five Gambling Devices, 346 U.S. 441, 445 (1953) (opinion of Jackson, J.).  The Supreme Court did not reach the constitutional issues raised; rather, six justices, in two plurality opinions, voted to uphold the district courts' dismissals of the indictments, but for different reasons. Id. at 446 ("We do not intimate any ultimate answer to the appellees' constitutional questions other than to observe that they cannot be dismissed as frivolous, nor as unimportant, to the nature of our federation."); see also id. at 452 (opinion of Black, J.). To avoid the constitutional questions, Justice Jackson read the act

---

U.S.C. § 1465 (production and distribution of obscene material affecting interstate commerce); 18 U.S.C. § 1591 (sex trafficking of children in or affecting interstate commerce); 18 U.S.C. § 2251A (buying or selling children in or affecting interstate commerce); 18 U.S.C. § 2252, 2252A (crimes in or affecting children involving child pornography).

as applying to solely interstate activities. <u>Id.</u> at 448-52
(opinion of Jackson, J.). Justice Black, on the other hand, opined
that the Act was meant to apply, albeit impermissibly, to local,
intrastate activity. <u>See</u> <u>id.</u> at 452 ("I do not feel at liberty to
read intrastate sales out of the Act, even if constitutional
questions could thereby be avoided.") (opinion of Black, J.).

While the Supreme Court's holding in <u>Five Gambling Devices</u> did
not address whether Congress's authority reached all gambling
devices irrespective of their place in or effect on interstate
commerce, Justice Jackson, writing for three justices, did make an
observation that directly addresses Defendant's instant challenge
to § 16913. He noted:

> No precedent of this Court sustains the power of Congress
> to enact legislation penalizing failure to report
> information concerning acts not shown to be in, or
> mingled with, or found to affect commerce. The course of
> decision relied on by the Government on analysis falls
> short of the holding asked of us here. Indeed, we find
> no instance where Congress has attempted under the
> commerce power to impose reporting duties under penal
> sanction which would raise the question posed by these
> proceedings.

<u>Id.</u> at 446 (opinion of Jackson, J.) (citing many of the cases and
statutes discussed above). Later, the same opinion noted that the
Government's interpretation of the Johnson Act as reaching all
conduct regardless of its place in or affect upon interstate
commerce would lead to the "most extreme impact upon affairs
considered normally reserved to the states." <u>Id.</u> at 450. <u>Five
Gambling Devices</u> was authored long after cases like <u>NLRB v. Jones</u>

& Laughlin Steel and Wickard v. Filburn solidified the New Deal.
Thus, the idea that Congress's Commerce Clause power stretched into
purely intrastate activity was not novel.  It was accepted and
universally applied, but six members of the Court still refused to
affirm the expansive reach Congress's power took in the Johnson
Act.

Little has changed since Five Gambling Devices, and the
criminal regulations that followed took three notable positions.
First, Congress has maintained its plenary authority to regulate
the channels and instrumentalities of interstate commerce.[7]
Second, Congress has continued to regulate local, intrastate
activities that it finds have a substantial affect on interstate
commerce.  See, e.g., United States v. Perez, 402 U.S. 146, 154
(1971) (affirming Congress's power to regulate local loan-sharking
activities based on the "class of activities" that substantially
affect interstate commerce); see also Resch, The Scope of Federal
Criminal Jurisdiction Under the Commerce Clause, 1972 U. Ill. L.
Rev. at 806.  The third is unlike the other two and it involves the

---

[7] See, e.g., 18 U.S.C. § 43 (travel in interstate commerce to
engage in animal terrorism); 18 U.S.C. § 228 (travel in interstate
commerce avoid paying child support); 18 U.S.C. § 1952 (travel in
interstate commerce or use of the mails with intent to commit a
number of common law crimes); 18 U.S.C. § 1958 (traveling to commit
murder-for-hire); 18 U.S.C. § 2101 (traveling to cause a riot); 18
U.S.C. § 2118 (traveling to engage in robbery involving controlled
substances); 18 U.S.C. § 2261 (traveling to commit interstate
domestic violence); 18 U.S.C. § 2261A (traveling to commit
interstate stalking); 18 U.S.C. § 2262 (traveling to violate
domestic protective order); 18 U.S.C. § 2423 (interstate travel to
provide minors for sex).

ability of Congress to criminalize the possession of firearms by convicted felons and the forcible taking of an automobile, so long as the weapon or vehicle has at one time traveled in interstate commerce.  Scarborough v. United States, 431 U.S. 563, 576 (1977) (upholding the felon in possession statute, then at 18 U.S.C. App. § 1202(a)); United States v. Williams, 51 F.3d 1004, 1008-90 (11th Cir. 1995) (upholding the federal carjacking statue, 18 U.S.C. § 2119).

In Scarborough v. United States, the defendant, a convicted felon, was convicted under the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. 90-351, 82 Stat. 197 (1968) (codified as amended in scattered sections of 5, 18, & 42 U.S.C.) for possessing firearms after having been previously convicted of a felony.  The defendant challenged his conviction by arguing that proof that the guns had "at some time" traveled in interstate commerce did not provide an adequate nexus between his possession and interstate commerce.  431 U.S. at 565-66.  The Court rejected his argument and upheld the conviction because the Government had proved an adequate nexus with interstate commerce by showing that the firearm had at some time previously moved in interstate commerce.  Id. at 565; see also id. at 577 (noting "Congress sought to reach possessions broadly, with little concern for when the nexus with commerce occurred").  Thus, the felon-in-possession statute criminalized the mere possession of a firearm by a criminal so long as the firearm at sometime traveled in or affected

interstate commerce, thereby creating a "minimal nexus" with interstate commerce. Id. at 575. The temporal proximity between the possession and the travel of the firearm in interstate commerce was ruled inconsequential. Id. at 577; Brent E. Newton, Felons, Firearms, and Federalism: Reconsidering Scarborough in Light of Lopez, 3 J. App. Prac. & Process 671, 683-84 (2001) (noting the constitutionally tenuous nexus between interstate commerce and the possession of a handgun). Further, the Defendant need not have procured the firearm through interstate commerce. As one court observed: "Scarborough's legal fiction . . . . is indelible and lasts as long as the gun can shoot. Thus, a felon who has always kept his father's World War II trophy Luger in his bedroom has the weapon 'in' commerce." United States v. Coward, 151 F. Supp. 2d 544, 549 (E.D. Pa. 2001).

The cases discussed above lead us to this point: The days of Gibbons and its natural and textually based constitutional limits on congressional power have long since passed. See United States v. Lopez, 514 U.S. at 584 (Thomas, J., concurring) ("[O]ur caselaw has drifted far from the original understanding of the Commerce Clause."). Hope is not lost, however, as recent Supreme Court precedent has begun again to enforce some limits on Congress's Commerce Clause power.

The Supreme Court's decision in United States v. Lopez, 514 U.S. 531 (1995), marked the first time in over fifty years that the Court struck down a congressional act passed under the Commerce

Clause.  The Gun-Free School Zones Act of 1990, Pub. L. 101-647 §
1702, 104 Stat. 4844 (1990) (formerly codified at 18 U.S.C. §
922(g)(1)(A)) (hereinafter "GFSZA"), made it a crime for an
individual to knowingly possess a firearm at a place the individual
reasonably should know is a school zone.[8]

Before addressing the constitutionality of the GFSZA in <u>Lopez</u>,
the Supreme Court summarized the past century of Commerce Clause
jurisprudence.  It identified three broad categories of activity
that Congress may regulate with recourse to the Commerce Clause:

> First, Congress may regulate the use of the channels of
> interstate commerce.  Second, Congress is empowered to
> regulate and protect the instrumentalities of interstate
> commerce, or persons or things in interstate commerce,
> even though the threat may come only from intrastate
> activities.  Finally, Congress' commerce authority
> includes the power to regulate those activities having a
> substantial relation to interstate commerce, <u>i.e.</u>, those
> activities that substantially affect interstate commerce.

514 U.S. at 558 (citations omitted).[9]  The first two categories
embody Congress's traditional power to regulate commerce.  <u>See</u>
<u>Raich</u>, 545 U.S. at 34-35 (Scalia, J., concurring in the judgment)
("The first two categories are self-evident, since they are the
ingredients of interstate commerce itself.").  By the GFSZA's text,
neither of these categories were implicated.  The third category
represents the fullest extent of Congress's power to regulate

---

[8] The GFSZA was passed as a portion of Title XVII of a thirty-
seven-title omnibus crime bill known as the Crime Control Act of
1990.  <u>See</u> Pub. L. 101-647.

[9] The cases cited by the Supreme Court in the portion of <u>Lopez</u>
quoted are discussed in Section III.B, <u>infra</u>.

commerce; it attaches to actions that have a substantial affect on interstate commerce, even though they may be local, non-economic activities.  Id.; United States v. Am. Building Maintenance Indus., 422 U.S. 271, 280 (1975) (observing that when Congress regulates behavior that substantially affects interstate commerce, it is asserting its "full Commerce Clause power").

In the third, "fullest extent" category, the Lopez Court recognized that "even . . . modern-era precedents which have expanded congressional power under the Commerce Clause confirm that this power is subject to outer limits."  514 U.S. at 556-57.  The Court summarized the holdings in Perez v. United States, 402 U.S. 146 (1971), Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241 (1964), and Wickard v. Filburn, 317 U.S. 111 (1942), as standing for the proposition that where purely local activity substantially affects interstate commerce, legislation regulating that activity will be sustained.  Lopez, 514 U.S. at 560.  Despite this, the Court found that the GFSZA, which prohibited the possession of all firearms in school zones, had "nothing to do with commerce or any sort of economic enterprise, however broadly one might define those terms."  Id. at 561.  Relying heavily on the non-economic character of the regulated activity of possessing a firearm in a school zone, and the lack of congressional findings supporting any effect on interstate commerce, the Court struck down the GFSZA as unconstitutional.

Several years after Lopez, in United States v. Morrison, 529

U.S. 598 (2000), the Court addressed whether a congressional act providing civil remedies for victims of gender-motivated violence was beyond the scope of Congress's power under the Commerce Clause.[10]  The Violence Against Women Act of 1994, Pub. L. 103-322, Title IV, §§ 4001, et seq., 108 Stat. 1902 (1994) (hereinafter "VWA"), provided a federal cause of action for anyone made a victim of a crime motivated by gender.  42 U.S.C. § 13981(c).  The VWA did not have any jurisdictional language denoting the constitutional power it was invoking.  By its terms, the VWA did not involve a regulation of the instrumentalities or channels of, or persons and things in, interstate commerce.  Thus, it dealt only with the third Lopez category.  Morrison, 529 U.S. at 609.

In analyzing whether the VWA could properly be enacted under Congress's Commerce Clause power, the Morrison Court looked to four factors it gleaned from Lopez to determine whether the conduct regulated by the VWA had a substantial effect on interstate commerce.  Under Morrison, a court must determine

> 1) whether the statute in question regulates commerce "or any sort of economic enterprise"; 2) whether the statute contains any "express jurisdictional element which might limit its reach to a discrete set" of cases; 3) whether the statute or its legislative history contains "express congressional findings" that the regulated activity affects interstate commerce; and 4) whether the link between the regulated activity and a substantial effect on interstate commerce is "attenuated."

---

[10] Morrison also addressed Congress's power under Section 5 of the Fourteenth Amendment.  That discussion is immaterial to the analysis herein.

United States v. Maxwell, 386 F.3d 1041, 1056 (11th Cir. 2004),
(quoting United States v. McCoy, 323 F.3d 1114, 1119 (9th Cir.
2003) (quoting Morrison, 529 U.S. at 610-12)), vacated, United
States v. Maxwell, 546 U.S. 801 (2005).

The Morrison Court addressed each factor in turn and found
that the VWA merely aimed to regulate non-economic, violent
criminal conduct; it purported to impose liability for all gender-
motivated violence, not only that violence affecting interstate
commerce.  529 U.S. at 613.  Though the VWA was buttressed "by
numerous findings regarding the serious impact that gender-
motivated violence has on its victims and their families," 529 U.S.
at 614, the Court dismissed these findings as evidence that "the
concern that we expressed in Lopez that Congress might use the
Commerce Clause to completely obliterate the Constitution's
distinction between national and local authority [was] well
founded."  Id. at 615.  Based on its review of the statute, the
Court found that the VWA did not regulate conduct having a
substantial effect on commerce.  Rather, it was a regulation of
local conduct.  In making such finding, the Court also "reject[ed]
the argument that Congress may regulate noneconomic, violent
criminal conduct based solely on that conduct's aggregate effect on
interstate commerce."  Id.

Five years after Morrison, the Supreme Court further defined
Congress's power to regulate local, intrastate activity in Gonzalez
v. Raich, 545 U.S. 1 (2005).  The facts and the holding in Raich

differed significantly from those in <u>Lopez</u> and <u>Morrison</u>. At issue
was the Controlled Substances Act, 21 U.S.C. §§ 801, <u>et</u> <u>seq.</u>
(hereinafter "CSA"), a "comprehensive statute [designed to] provide
meaningful regulation over legitimate sources of drugs to prevent
diversion into illegal channels, and strengthen law enforcement
tools against the traffic in illicit drugs." <u>Raich</u>, 545 U.S. at
10.

Raich and others sued the Attorney General and Drug
Enforcement Administration, seeking a permanent injunction against
enforcement of the CSA against them. They argued that their
intrastate production, distribution, and ingestion of marijuana for
medicinal purposes was lawful under California's Compassionate Use
Act of 1996, Cal. Health & Safety Code Ann. § 11362.5 (2005), and
that the "categorical prohibition of the manufacture and possession
of marijuana as applied to intrastate manufacture and possession of
marijuana for medical purposes pursuant to California law exceeds
Congress' authority under the Commerce Clause." 545 U.S. at 15.

In <u>Raich</u>, the Court drew heavily on the holding and analysis
in <u>Wickard</u> and affirmed the principle that Congress can regulate
purely local, non-economic activities "that are part of an economic
'class of activities' that have a substantial effect on interstate
commerce." <u>Raich</u>, 545 U.S. at 17 (citations omitted). In doing
so, Congress may regulate purely intrastate activity that is not
itself "commercial," insofar as it is not produced for sale in the
market, if it has a reasonable basis to conclude "that failure to

regulate that class of activity would undercut the regulation of
the interstate market in that commodity." <u>Id.</u> at 18.  The fact
that only a small quantity of marijuana is consumed does not
control whether Congress can regulate it.  <u>See</u> <u>id.</u> at 17 (noting
that the <u>de</u> <u>minimis</u> character of individual instances is immaterial
when a general regulatory statute bears a substantial relation to
commerce) (citation omitted).  This permits Congress to regulate
intrastate activity, whether economic or not, when it has
comprehensively regulated an economic market that the challenged
activity is part of.  <u>Id.</u>  Put another way, Congress may regulate
intrastate, non-commercial activities so long as there is a
reasonable basis to believe that its inability to regulate such an
activity would undermine its ability "to implement effectively the
overlying economic regulatory scheme." <u>Maxwell</u>, 446 F.3d at 1215.

　　　　Under <u>Raich</u>, courts have a limited role in reviewing whether
a "class of [non-commercial] activity . . . undercut[s] Congress'
unquestioned authority to regulate the broader interstate market."
<u>Id.</u> at 1215.  The Court does not look at whether the regulated
activity taken in the aggregate actually has a substantial effect
on interstate commerce; rather, the Court looks to determine
whether there is a rational basis for Congress to conclude that it
does.  <u>Raich</u>, 545 U.S. at 22; <u>see also</u> <u>Maxwell</u>, 446 F.3d at 1215
(recognizing that "Congress need only have a <u>rational basis</u> for
[so] concluding") (quotation omitted).

　　　　<u>Raich</u> clearly sets forth the Court's standard for reviewing

congressional regulation of intrastate, non-economic actions that may affect a larger economic regulatory scheme.  However, it does not set forth the standard applied to local, non-economic activity that is not part of a comprehensive regulation of interstate commerce.   The majority in <u>Raich</u> went to great lengths to distinguish the facts of <u>Lopez</u>, which it described as dealing with "a brief, single-subject statute making it a crime for an individual to possess a gun in a school zone." <u>Raich</u>, 545 U.S. at 23.  It distinguished the "GFSZA" as "at the opposite end of the regulatory spectrum," while the CSA is "a lengthy and detailed statute creating a comprehensive framework for regulating the production, distribution, and possession of five classes of 'controlled substances.'"  Id. at 24.

## B. The Present

Here we are.  With over a century of caselaw defining Congress's power under the Commerce Clause to criminalize conduct, certain principles are clear; others are not.  Among the standard principles that have not changed much since <u>Gibbons</u> and <u>The Lottery Case</u> is Congress's power over what <u>Lopez</u> summarized as "the channels of interstate commerce" and its ability "to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." <u>Lopez</u>, 514 U.S. at 558.  When Congress chooses to regulate those areas, it is using its traditional Commerce Clause power. <u>Raich</u>, 545 U.S. at 34 (Scalia,

J., concurring in the judgment).  The precise limits of the third Lopez category concerning activities that substantially affect interstate commerce is not as clear.  For all its analysis, Raich left this question unanswered: whether a statute not part of a larger scheme regulating an economic market is analyzed only under its framework or whether the four-factor test articulated in Morrison is still valid.  See Maxwell, 446 F.3d at 1217 n.6 (noting the "confusion that may arise from the now un-clear state of the four Morrison/Lopez factors post-Raich.")

Unfortunately, since Lopez was handed down courts have based much of their analysis on the literal language of the Lopez categories, rather than what they signify.  The precise meaning of the Lopez categories cannot be derived by the plain meaning of the terms used.  Instead, courts must look both to the cases Lopez cited in support of each category and the instances of congressional action sustained under each.  Upon surveying the recent cases upholding SORNA, it is clear that the greatest area of confusion lies in the precise meaning of the first two Lopez categories.

The first Lopez category states, "Congress may regulate the use of the channels of interstate commerce."  Lopez, 514 U.S. at 558.  In support of this proposition the Court cites two cases, with a parenthetical quoting a third: United States v. Darby, 312 U.S. 100, 113-115 (1941); Heart of Atlanta Motel, 379 U.S. at 256 (quoting Caminetti, 242 U.S. at 491).  In Darby the Court upheld

Congress's ability to ban the interstate shipment of goods produced without minimum wage and maximum hour protections. _Darby_, 312 U.S. at 113-15.  In _Heart of Atlanta Motel_, the Court ultimately upheld the public accommodation provisions of the Civil Rights Act of 1964 under Congress's power to regulate activities that substantially affect interstate commerce.  _Heart of Atlanta Motel_, 379 U.S. at 257.  However, the pertinent part of the opinion cited by _Lopez_ concerned Congress's power to regulate persons in interstate commerce, through its regulation of the channels of interstate commerce to keep the channels "free from immoral or injurious uses."  _Id._ at 256 (quoting _Caminetti_, 242 U.S. at 491).  In support of this proposition, the Court in _Heart of Atlanta Motel_ cited Congress's ability to ban the interstate shipment and travel of lottery tickets, women for immoral purposes, and stolen vehicles.  _Id._ at 256-57 (citing _The Lottery Case_, 188 U.S. 321; _Caminetti_, 242 U.S. 470; _Hoke_, 227 U.S. at 320; _Brooks_, 267 U.S. 432) (further citations omitted).  _See also Darby_, 312 U.S. at 113 (citing, _inter alia_, the same cases).  Thus, the first _Lopez_ category encompasses Congress's ability to "exclude from the commerce articles whose use in the states for which they are destined it may conceive to be injurious to the public health, morals or welfare."  _Darby_, 312 U.S. at 114.

In this way, by the first _Lopez_ category Congress is regulating interstate commerce by barring from its channels a certain class of goods or people that it deems harmful.  _See United_

States v. Rybar, 103 F.3d 273, 288-89 (3d Cir. 1996) (Alito, J.,
dissenting) (describing the first Lopez category as concerning
"Congress's power to regulate, for economic or social purposes, the
passage in interstate commerce of either people or goods").  By
excluding certain persons from the channels of interstate commerce,
the focus of the prohibition is on the person or thing's movement
across state lines with the proscribed purpose or status.  Id.  In
Caminetti, the proscribed activity was travel to become, or engage
in the activities of, a prostitute.  The law was not concerned with
young women who, after crossing state lines, may later decide to
become prostitutes; its focus is only on the use of the channels of
interstate commerce to become one.[11]  All of the statutes that fall
within the first category in Lopez maintain this jurisdictional
character.  United States v. Patton, 451 F.3d 615, 621 n.3 (10th
Cir. 2006).

     Under the second Lopez category "Congress is empowered to

---

[11] In Caminenti the Court noted that:

It may be conceded, for the purpose of the argument, that
Congress has no power to punish one who travels in
interstate commerce merely because he has the intention
of committing an illegal or immoral act at the conclusion
of the journey.  But this act is not concerned with such
instances.  It seeks to reach and punish the movement in
interstate commerce of women and girls with a view to the
accomplishment of the unlawful purposes prohibited.

242 U.S. at 491 (emphasis added); see United States v. Patton, 451
F.3d 615, 621 n.3 (noting the same); Rybar, 103 F.3d at 288 (Alito,
J., dissenting) (same).

regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." 514 U.S. at 558. In support of this proposition, the Supreme Court in <u>Lopez</u> cited three cases, with the third citing two statutes: <u>Houston, E. & W. Tex. Ry. v. United States (Shreveport Rate Cases</u>), 234 U.S. 342 (1914); <u>Southern R.R. Co. v. United States</u>, 222 U.S. 20 (1911); <u>Perez v. United States</u>, 402 U.S. 146, 150 (1971) (citing 18 U.S.C. § 32 (destruction of an aircraft) and § 659 (theft of interstate shipments)). In the <u>Shreveport Rate Cases</u>, the Court upheld the regulation of intrastate railroad rates on the theory that this regulation was needed to protect "the security of [interstate] traffic," and "the efficiency of the interstate service." 234 U.S. at 351. In the second case, <u>Southern R.R. Co.</u>, the Court sustained certain federal safety regulations governing trains and railroad cars traveling intrastate on a railroad line. 222 U.S. at 27. In sustaining these regulations, the Court reasoned that the lack of appropriate safety appliances on intrastate trains and cars was a hazard to trains moving in interstate commerce. <u>Id.</u> at 27. Thus, to effectively regulate interstate trains––an instrumentality of interstate commerce––Congress may also regulate purely intrastate trains.[12]

---

[12] For a more detailed discussion of this category, see <u>Patton</u>, 451 F.3d at 620-22, and <u>Bishop</u>, 66 F.3d at 597-98 (Becker, J., concurring in part and dissenting in part).

With these two cases, the Court in Lopez also cited Perez and two of the statutes it cited as comprising this second category. Lopez, 514 U.S. at 558, citing Perez, 402 U.S. at 150 (citing 18 U.S.C. §§ 32, 659). At the time Perez was decided, § 32 made it a crime to damage or destroy an aircraft that was used in interstate commerce, while § 659 made it a federal crime to steal from interstate shipments. 18 U.S.C. §§ 32, 659 (1966). In United States v. Rybar, then-Circuit Judge Alito summarized these cases and statutes under the second Lopez category, noting that they exemplify the principle that Congress's Commerce Clause authority

> reaches threats to "the instrumentalities" of interstate commerce, i.e., the means of conveying people and goods across state lines, such as airplanes and trains. This power also reaches threats to people and goods traveling in interstate commerce, such as the theft of goods moving interstate and the setting of rates that could affect interstate trade.

Rybar, 103 F.3d at 598 (Alito, J., dissenting). In this way, the second Lopez category embodies Congress's authority to protect and regulate the instrumentalities and the people and "things that the instrumentalities are moving." United States v. Bishop, 66 F.3d 569, 598 (3d Cir. 1995) (Becker, J., concurring in part dissenting in part); see also Patton, 451 F.3d at 622. The Supreme Court's use of the formula "persons or things in interstate commerce, even though the threat may come only from intrastate activities" is addressed to Congress's power to regulate and protect such persons from threats while traveling or about to travel in interstate commerce. It does not mean that once a person has traveled in

interstate commerce a regulation is attached to him.  See Gibbs v. Babbitt, 214 F.3d 483, 491 (4th Cir. 2000) (rejecting the argument that a wolf that has once moved in interstate commerce is forever a "thing in interstate commerce").  Indeed, "[t]he illustrative cases for [the second] category involve things actually being moved in interstate commerce, not all people and things that have ever moved across state lines."  Patton, 451 F.3d at 622 (emphasis added).

While Congress's traditional power under the first two Lopez categories has been standardized over the past century, what has changed over that time is Congress's ability to regulate local, intrastate activities having a substantial effect on interstate commerce.  It is now and has always been clear that Congress's power to regulate local, non-economic conduct is not limitless.  See Gibbons, 22 U.S. (9 Wheat.) at 189.  If nothing else, Lopez and Morrison affirm that maxim.  Lopez, 514 U.S. at 552, 556-57; Morrison, 529 U.S. at 607.  What is less clear is how courts should analyze challenges to Congress's power to regulate non-economic conduct in light of Raich.  See Maxwell, 446 F.3d at 1217 n.6 (noting the "confusion that may arise from the now un-clear state of the four Morrison/Lopez factors post-Raich").  Raich did not explicitly address how, if at all, it was affecting the four-factor test from Morrison.[13]  Likewise, there is no clear direction from

_____

[13] In Justice Scalia's concurrence in Raich he addresses these problems and finds that Lopez and Morrison are alive and well after

the Eleventh Circuit on how to approach this open question.  Id.

Raich is the governing law, and its holding cannot be ignored
or minimized.  However, a proper understanding of the Raich holding
cannot be separated from the nature of the CSA it upheld.  While
there has been little guidance from the appellate courts on how
Raich affects Lopez and Morrison, they can be distinguished by the
nature of the statute that each case dealt with.  In this way,
Raich defines the reach that congressional power may take over
local activities when that regulation is part of a greater overall
commercial regulation of an interstate market.  When a statute is
challenged under such a regulatory scheme, courts must give great
deference to the findings of Congress and determine whether it had
a reasonable basis to believe that the regulated activity will have
a substantial effect on interstate commerce.  On the contrary,
Morrison and Lopez stand for the proposition that Congress may not
regulate local, non-economic activities that do not have a
substantial impact on interstate commerce; in making this

_____

Raich.  He synthesizes their holdings with the judgment in Raich by
looking to whether the intrastate activity being regulated is part
of a larger economic scheme of regulation.  Raich, 545 U.S. at 38-
39 (Scalia, J., concurring in the judgment).  When Congress has
such a scheme in place it need only have a rational basis to
believe that the local activity, in the aggregate, could have a
substantial effect on interstate commerce.  When the regulation at
issue is not an essential part of a larger regulation of economic
activity then the holdings of Lopez and Morrison still apply.  Id.
at 41 n.3 (citing Lopez, 514 U.S. at 561).  His concurrence,
however, it is not binding as to whether lower courts are to engage
in the four-factor test outlined in Morrison or simply proceed
under Raich.

determination the Court does not aggregate the instances of individual behavior. <u>Morrison</u>, 529 U.S. at 615.

IV. <u>Analysis</u>

The Court's categorization of <u>Raich</u> and <u>Lopez</u> is its own, and without guidance from the Eleventh Circuit or Supreme Court, the Court will proceed in an abundance of caution and apply the tests in both <u>Raich</u> and <u>Morrison</u> to § 16913.  Further, the Court will address the constitutionality of § 2250 under the traditional limits that have been attached to Congress's Commerce Clause power. Additionally, in Part IV.B.3, the Court will address the Government's brave new argument that this Court should apply the "minimal nexus" test used in <u>United States v. Scarborough</u> to Defendant's travel under § 2250.

A. <u>Section 16913</u>

A conviction for failure to register as a sex offender under § 2250(a) is predicated upon proof that a defendant was required to register under § 16913.  18 U.S.C. § 2250(a)(1) ("Whoever: is required to register under the Sex Offender Registration and Notification Act . . . .").  In turn, § 16913 requires all persons defined as "sex offenders" in the United States to register in each jurisdiction where the offender resides, is a student, and is employed.[14]  Defendant argues that § 16913 exceeds Congress's Commerce Clause power, because registration as a sex offender is a

---

[14] "The term 'sex offender' means an individual who was convicted of a sex offense."  42 U.S.C. § 16911(1).

37

purely local, non-economic activity, and there is no overarching economic regulation that such a regulation would have a substantial impact upon.

Any analysis of a challenged statute begins with its text and through its text the Court normally can determine both the power that Congress is attempting to exercise and whether it has been vested with such authority. Here, § 16913 states: "A sex offender shall register, and keep the registration current, in each jurisdiction where the offender resides, where the offender is an employee, and where the offender is a student."  42 U.S.C. § 16913(a).  Section 16913 particularly and SORNA generally are silent as to Congress's invocation of constitutional authority. See Untied States v. Waybright, 561 F. Supp. 2d 1154, 1164 (D. Mont. Jun. 11, 2008) (noting the statute does not have a jurisdictional element).  In the face of this congressional silence the Government urges this Court to assume, and all other courts to consider the issue have assumed, that Congress has invoked its Commerce Clause power to enact § 16913.  Without any other reasonable basis of authority, the Court will limit its analysis of § 16913 to Congress's Commerce Clause power.  See Woods v. Cloyd W. Miller Co., 333 U.S. 138, 144 (1948) ("The question of the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise.").  Like the regulation at issue in Five Gambling Devices, § 16913 simply requires all persons defined as sex offenders to register in each

jurisdiction where they reside, are employed, or attend school. Thus, by this statute Congress is attempting to regulate purely intrastate activities.  It may do so only through the full breadth of its Commerce Clause power to regulate activities that substantially affect interstate commerce, commonly referred to as the third Lopez category.  See Raich, 545 U.S. at 16-17; Lopez, 514 U.S. at 558-59.

To determine whether a regulated activity has a substantial impact on interstate commerce, courts either engage in the four-part inquiry set forth by Morrison, 529 U.S. at 610-13, or the analysis undertaken in Raich.  As noted earlier, Raich has muddied the waters of Morrison and Lopez.  At first glance, Raich seems inapplicable to § 16913 because the registration of sex offenders is not an economic activity.  Nonetheless, Raich is a binding Supreme Court case and the Court will address the constitutionality of § 16913 against the analysis set forth therein and the one employed in Morrison.

## 1. Applying Raich

Raich analyzed a regulation of local activity, possession of medical marijuana, in the context of a larger economic regulation, the Controlled Substances Act.  Raich clearly spelled out the analysis to be employed in such instances; however, it did not address how courts are to frame the larger economic regulation. Here, § 16913 is a critical part of SORNA, and SORNA is one of the many pieces of legislation embodied in the Adam Walsh Act.  In

39

Waybright, the Court limited its analysis of § 16913 to SORNA alone and did not analyze its place and impact on the Adam Walsh Act. Waybright, 561 F. Supp. 2d at 1163-65. In contrast, another district court that upheld the constitutionality of § 16913 framed the Raich analysis with reference to the larger Adam Walsh Act, including its regulation of child pornography.   United States v. Passaro, CR 07-2308-BEN (S.D. Cal. Dec. 17, 2007) (cited in Waybright, 561 F. Supp. 2d at 1164).

In Raich, the question was whether Congress had a reasonable basis to believe that local consumption of marijuana interfered with its nationwide regulation of the market for controlled substances.   Raich, 545 U.S. at 13-14.   It did not look at the smaller subparts of the CSA or how local marijuana consumption would affect Congress's ability to regulate the market for marijuana alone.   Id. at 14-15.   However, the actual language used by the Court refers to a particular commodity, not a particular class of commodities.   Raich, 545 U.S. at 18 (noting that "failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity") (emphasis added).   Thus, it is unclear where exactly the Supreme Court was headed. Therefore, in an abundance of caution the Court will analyze § 16913 in reference to both SORNA and the Adam Walsh Act as a whole.

a. Section 16913 as Part of SORNA

The immediate question is whether § 16913 is part of a broader economic regulation contemplated in SORNA.   See Raich, 545 U.S. at

26.  In contrast to the CSA, SORNA is not a comprehensive economic regulation of an interstate market.  Waybright, 561 F. Supp.2d at 1166-67.  To be clear, SORNA is comprehensive.  It includes provisions governing the national registry requirements for individuals, the duration of the registration requirements, the requirement of registration for sex offenders entering the country, and consequences of states failing to comply with the statute.  42 U.S.C. §§ 16913-16915, 1625-1628.  However, the stated purpose of SORNA is to establish a national sex offender registry to "protect[] the public from sex offenders and offenders against children."  42 U.S.C. § 16901.  This is not economic.  See Raich, 545 U.S. at 25-26 (defining "economics" as the "production, distribution, and consumption of commodities") (citation omitted).

In Waybright, the court construed SORNA as purporting to regulate the market of sex offenders themselves, reasoning that there is "no market for sex offenders."  See Waybright, 561 F. Supp. 2d at 1166.  Sex offenders are persons.  Their place in commerce, like any other person, is limited to being actors through whom commercial exchanges are made, either in the production, sale, or purchase of goods.  The mere labeling of a person as "sex offender" does not create in him the distinction of being a commercial enterprise or transform him into a commodity that Congress may regulate.  The Court in Waybright was correct, there is no market for sex offenders; however, by equating the regulated activity with the market, it framed the overlying scheme too

41

narrowly.

Raich did not look at whether there was an interstate market for home-grown marijuana, but whether there was an overlying economic scheme that Congress reasonably believed would be affected by its inability to regulate home-grown marijuana. Raich, 545 U.S. at 17-18. The market regulation was the CSA as an integrated whole. In the instant case, the analysis must center on SORNA. The Court looks to whether SORNA is set up as an omnibus regulation of an economic sector.

The laws that constitute SORNA all aim for one purpose: the creation and dissemination of a convenient body of information for the aid of law enforcement. 42 U.S.C. § 16901 ("establish[ing] a comprehensive national system for the registration of [sex] offenders"). This particular body of information is not a commodity, because no commercial value attaches to it beyond its service in law enforcement's efforts to track sex offenders. Further, nothing in SORNA's various statutes contemplates that the information will be purchased, traded, or consumed by anyone outside law enforcement. In that way, SORNA is similar to a veteran police officer compiling a list of known drug trafficking locations and likely dealers.

It is impossible to read SORNA, in its twin aims of branding certain persons sex offenders and administratively recording their personal information, as regulating an economic market. The Court finds that there is no market for the personal information of sex

offenders.  Even assuming that an entrepreneurial soul could find
an economic use for this information, the Court notes that the
information is mandated by Congress to be readily accessible by the
public over the Internet.  42 U.S.C. § 16918(a).  Thus its
commercial value, if it ever had any, becomes zero.

In addition to determining whether there was an overlying
economic regulation, Raich looked to whether Congress had a
reasonable basis to believe that the challenged statute regulated
behavior that could, in the aggregate, affect interstate commerce.
Raich, 545 U.S. at 22.  Here there is no congressional record to
support Congress having a reasonable basis to conclude that the
registration of or failure to register sex offenders would have an
impact on a commercial market.  See generally, Adam Walsh Act, Pub.
L. 109-248, 120 Stat. 587; see also Waybright, 561 F. Supp. 2d at
1165  ("SORNA's  legislative  history  contains  no  express
congressional findings regarding the effects of sex offender
registration on interstate commerce.").  Thus, the Court cannot
uphold § 16913 as part of SORNA.

b. Section 16913 as Part of the Adam Walsh Act

Before analyzing § 16913 and its effect upon the entire Adam
Walsh Act, the Court pauses to consider whether this broader
analysis is even warranted.  In Lopez, the Supreme Court found that
the GFSZA was "not an essential part of a larger regulation of
economic activity" and "by its terms has nothing to do with
'commerce.'"  Lopez, 514 U.S. at 561.  The GFSZA would later be

43

described by the Court in <u>Raich</u> as "a brief, single-subject statute." <u>Raich</u>, 545 U.S. at 23. However, the GFSZA was passed in Title XVII of Pub. L. 101-647. <u>See</u> Public Law 101-647, § 1702. That overall Public Law was passed as The Crime Control Act of 1990. Other titles of the Crime Control Act, related to interstate commerce, included Title I (International Money Laundering); Title VIII (Rural Drug Enforcement); Title XIV (Money Laundering); Title XV (Drug-Free School Zones); Title XVII, § 1704 (Railroad Police Officers); Title XIX (Anabolic Steroids); Title XXIII (Chemical Diversion and Trafficking); Title XXIV (Drug Paraphernalia); Title XXV (Banking Law Enforcement); Title XXVI (Opium Imports); and Title XXVII (Methamphetamine Offenses).[15]  However, the Supreme Court did not address these regulations of economic markets when dealing with the GFSZA specifically.

Similarly, the Adam Walsh Act is a statute with broad reach into many areas. While SORNA regulates only sex offenders, other areas regulated by the Adam Walsh Act involve interstate commerce, including Title V (Child Pornography); Title II, § 201 (Prohibition On Internet Sales of Date Rape Drugs); and Title VII (Internet Safety). <u>See Maxwell</u>, 446 F.3d at 1216-17 (finding a market for child pornography and upholding congressional regulation of same); <u>United States v. Hornaday</u>, 392 F.3d 1306, 1310-11 (11th Cir. 2004)

---

[15] Titles VIII, XV, XIX, XXIII, XXIV, XXVI, and XXVII of Pub. L. 101-647, related to drugs, may not appear on the surface to be related to interstate commerce. However, as <u>Raich</u> makes clear, they are legitimate exertions of Congress's commerce power.

(upholding congressional regulation of the internet under the Commerce Clause). Thus, under the analysis employed in Lopez, it appears that, like the GFSZA that was a subpart of the Crime Control Act of 1990, SORNA should be analyzed without reference to the greater scheme of the Adam Walsh Act. Because § 16913 cannot be upheld as part of SORNA, as stated above, the Indictment herein must be set aside. However, without the benefit of guidance from a reviewing court on this issue, the Court now turns to analyzing § 16193 as part of the Adam Walsh Act in general.

Like SORNA itself, the Adam Walsh Act is a comprehensive regulation, only more so. It was passed as "[a]n Act to protect children from sexual exploitation and violent crime, to prevent child abuse and child pornography, to promote Internet safety, and to honor the memory of Adam Walsh and other child crime victims." Pub. L. 109-248, 120 Stat. 587. It is an ambitious project by Congress, portions of which regulate economic markets. See, e.g., Maxwell, 446 F.3d at 1216-17 (recognizing congressional authority over the market for child pornography). However, it is not an omnibus regulation of an economic sector in the same manner as the CSA.

While the Adam Walsh Act does regulate commercial markets, Congress has no findings linking the regulation of sex offenders in § 16913 with, for example, the interstate child pornography market. In its briefing, the Government has not filled in the gap. The only findings that Congress has made in the Adam Walsh Act are in

specific regards to the distribution of child pornography.[16]  These findings support the ability of Congress to regulate intrastate, non-commercial activity that affects the interstate regulation of child pornography.  See Maxwell, 446 F.3d at 1216-18.  But nothing suggests a reasonable basis for Congress to believe that the registration of sex offenders under § 16913 has any affect on its ability to regulate and prevent child pornography traveling in interstate commerce.  But see Passaro, CR 07-2308-BEN (S.D. Cal. Dec. 17, 2007) (finding that the permissible aim of regulating child pornography would be undercut if sex offenders are not registered).

The Court is unwilling to conjecture, based simply on the fact that both child pornography and sexual offenses are particularly heinous crimes, that a connection necessarily arises between them.  See United States v. Hodson, 543 F.3d 286, 292 (6th Cir. Sep. 19, 2008) (holding that probable cause to arrest for the crime of child molestation does not translate to probable cause for the "entirely different crime" of child pornography).  There is nothing in SORNA or the Adam Walsh Act that ties the national registration of sex offenders in § 16913 into permissible congressional regulation of

---

[16] Among the findings made by Congress in that regard is that "[i]ntrastate incidents of production, transportation, distribution, receipt, advertising, and possession of child pornography, as well as the transfer of custody of children for the production of child pornography, have a substantial and direct effect upon interstate commerce."  Pub. L. 109-248, § 501(D).  The congressional findings go on to list bases for Congress to come to this conclusion.  Id. § 501(D)(i)-(iii).

interstate markets.   There is no connection between SORNA and interstate commerce shown, and the Court is unable to force one into existence.   <u>See</u> <u>Lopez</u>, 514 U.S. at 562-68; <u>Morrison</u>, 529 U.S. at 614-18; <u>Raich</u>, 545 U.S. at 54-56 (O'Connor, J., dissenting). Without this link, there is no basis to find that Congress could have a reasonable belief that the registration of sex offenders would have a substantial impact on an economic market, and the analysis of whether the Adam Walsh Act as a whole can provide a constitutional basis for § 16913 falls back on the analysis of SORNA itself.   Thus, § 16913 cannot stand as a constitutionally permissible use of Congress's Commerce Clause power under <u>Raich</u>.

## 2. <u>Applying Lopez/Morrison</u>

As previously stated, § 16913 does not purport to regulate a channel of interstate commerce or an instrumentality of interstate commerce.   Thus, it must be analyzed under the third <u>Lopez</u> category: activities that substantially affect interstate commerce. In <u>Morrison</u>, the Supreme Court articulated four factors that are to guide courts' determinations of whether an activity substantially affects interstate commerce.   A court must ask

> 1) whether the statute in question regulates commerce "or any sort of economic enterprise"; 2) whether the statute contains any "express jurisdictional element which might limit its reach to a discrete set" of cases; 3) whether the statute or its legislative history contains "express congressional findings" that the regulated activity affects interstate commerce; and 4) whether the link between the regulated activity and a substantial effect on interstate commerce is "attenuated."

<u>Maxwell</u>, 386 F.3d at 1056 (citations and procedural history

omitted).  In addressing these factors, the Court may not consider the aggregate impact of non-economic activity on interstate commerce.  Morrison, 529 U.S. at 615 ("We accordingly reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce.").

First, § 16913 does not involve commerce or any sort of economic activity.  It regulates the registration of a person, a non-economic unit.  See Waybright, 561 F. Supp. 2d at 1166. Second, there is no express jurisdictional element to limit the registration of sex offenders to a discrete set of cases.  In fact, § 16913 does not contain any jurisdictional element at all.  It is a blanket regulation falling upon all sex offenders, whether or not they have traveled across state lines or whether or not they undertake any action related to interstate commerce.  See id. at 1165; United States v. Thomas, 534 F. Supp. 2d 912, 920 (N.D. Iowa Feb. 13, 2008).  It regulates a person who is a sex offender without reference to any activity affecting--or not affecting-- interstate commerce that he may undertake.  See 42 U.S.C. § 16913(a) ("A sex offender shall register . . . .").

Much of the third and fourth Morrison factors are addressed at length above; nonetheless, the Court will briefly touch upon them. Third, neither the statute nor its legislative history contain any congressional findings as to how the regulation of sex offenders affects interstate commerce.  Thomas, 534 F. Supp. 2d at 920.

Nothing links the registration of sex offenders with interstate commerce.[17]   While the Court is mindful that Congress is not required to make such findings to support its legislation, they are to be considered when looking at a statute of dubious constitutionality.   Morrison, 529 U.S. at 612 (noting that such findings "enable us to evaluate the legislative judgment that the activity in question substantially affect[s] interstate commerce, even though no such substantial effect [is] visible to the naked eye"), quoting Lopez, 514 U.S. at 563.

Indeed, it would be impossible for Congress to make any such finding linking § 16913 with interstate commerce because the statute does not regulate an activity at all.  Rather, it regulates a status, namely being a sex offender.  A person labeled with the mutable characteristic "sex offender" does not thereby impact interstate commerce any more than one with the mutable characteristics of, for example, "over 60," "double-Domer," or "Jack Bauer fan."  No one would argue that these characteristics alone can empower Congress under the Commerce Clause to regulate those who bear them.

Fourth, because there is nothing to link the registration of

---

[17] Courts are deferential to the factual findings made by Congress that prompt it into legislative action.  See Gonzales v. Carhart, 550 U.S. ___, 127 S. Ct. 1610, 1638 (2007).  Without a record made by Congress to articulate a link between the mere existence of a sex offender and interstate commerce, and without the Government offering one in its briefing, the Court is unable to conclude that one exists.

sex offenders with interstate commerce, any contrived link is not only attenuated but illusory.  Morrison, 529 U.S. at 612 (looking to "whether the link between the regulated activity and a substantial effect on interstate commerce is attenuated").  Therefore, under Morrison, the Court cannot conclude that the individual behavior of a sex offender registering or failing to register under § 16913 has a substantial impact on interstate commerce.  Thus, Congress has exceeded its commerce power in the passage of § 16913 and the Court strikes the same down today.

### 3. Section 16913 is Unconstitutional

It is beyond question that § 16913 is sui generis.  See Yung, One of These Laws is Not Like the Others, supra.  It is unlike the so-called "single-issue statutes" struck down in Lopez and Morrison, and is unlike the comprehensive CSA upheld in Raich.  It most closely resembles the Johnson Act, 15 U.S.C. §§ 1171-1177, at issue in Five Gambling Devices, 346 U.S. 441.  There, as it has here, Congress sought to regulate through compulsive registration, without regard to participation in or movement through interstate commerce.  Id. at 446 (opinion of Jackson, J.).  In striking § 16913 down, the Court draws attention to the plurality opinion in Five Gambling Devices authored by Justice Jackson, which noted: "No precedent of this Court sustains the power of Congress to enact legislation penalizing failure to report information concerning acts not shown to be in, or mingled with, or found to affect commerce."  Id.  The principle that Congress has never been given

the power to enact such a regulation has not changed since <u>Five Gambling Devices</u> was handed down.

Because a criminal conviction under 18 U.S.C. § 2250 cannot stand without the Government first establishing that Defendant is required to register as a sex offender under § 16913, the Court will grant Defendant's Motion To Dismiss (DE 17).  While the Court's analysis can naturally end at this point, having addressed § 16913, a reviewing Court may disagree with the foregoing analysis and the Court would then be forced to address the constitutionality of § 2250 on remand.  Therefore, in the interest of judicial economy, the Court will address the much-debated constitutionality of § 2250.

### B. <u>Section 2250</u>

As noted above, the first two categories in <u>Lopez</u> are considered the traditional reach of Congress's authority under the Commerce Clause, while the third represents the full extent of its commerce power through the Necessary and Proper Clause.  <u>Raich</u>, 545 U.S. at 34 (Scalia, J., concurring in the judgment).  Over the past two years, numerous courts have analyzed the constitutionality of § 2250, with some upholding it under the third <u>Lopez</u> category. <u>E.g.</u>, <u>United States v. Madera</u>, 474 F. Supp. 2d 1257, 1265 (M.D. Fla. 2007) (upholding SORNA under the analysis applied in <u>Raich</u>), <u>rev'd on other grounds</u> 528 F.3d 852 (11th Cir. May 23, 2008); <u>United States v. Mason</u>, 510 F. Supp. 2d 923, 932 (M.D. Fla. 2007); <u>United States v. Hinen</u>, 487 F. Supp. 2d 747, 757-59 (W.D. Va. 2007)

(upholding SORNA under <u>Lopez</u> and <u>Morrison</u>).  Other courts have
addressed the constitutionality of § 2250 and upheld it under the
first two <u>Lopez</u> categories: Congress's ability to regulate either
the channels of interstate commerce, or the instrumentalities of
interstate commerce or persons or things in interstate commerce.
<u>E.g.</u>, <u>United States v. May</u>, 535 F.3d 912 (8th Cir. Jul. 31, 2008)
(upheld under the first <u>Lopez</u> category); <u>Thomas</u>, 534 F. Supp. 2d
at 918 (upholding SORNA under the second <u>Lopez</u> category).  Only one
case has held that § 2250 is unconstitutional: <u>United States v.
Powers</u>, 544 F. Supp. 2d 1331 (M.D. Fla. April 18, 2008).  <u>See</u> Blum,
<u>Validity of SORNA</u> § 17.

In moving this Court to dismiss the Indictment, Defendant
relies heavily on the reasoning put forth in <u>Powers</u>.  There, the
district court analyzed § 2250 under the third <u>Lopez</u> category, and
struck it down as unconstitutional because the regulated activity
does not have a substantial impact on interstate commerce under
<u>Morrison</u>.  <u>Powers</u>, 544 F. Supp. 2d at 1135.  In <u>Powers</u>, the court
did not address whether § 2250 invokes Congress's traditional power
to regulate interstate commerce.

Upon careful review of the text of § 2250 and the governing
caselaw, the Court is unpersuaded by the reasoning either of <u>Powers</u>
or those courts that have read the statute as a permissible
regulation of persons in interstate commerce.  Contrary to the
holding in <u>Powers</u>, § 2250 purports to regulate persons designated
as sex offenders who "travel[] in interstate or foreign commerce."

18 U.S.C. § 2250(a)(1)(B). Courts operate with the understanding that Congress is capable of saying what it wants and meaning what it says. CBS Inc. v. PrimeTime 24 Joint Venture, 245 F.3d 1217, 1222 (11th Cir. 2001). The phrase "in interstate commerce" is a term of art that Congress employs when it uses its power under the first two categories identified in Lopez. United States v. Ballinger, 395 F.3d 1218, 1227 (11th Cir. 2005) (en banc); Thomas, 534 F. Supp. 2d at 918. By limiting § 2250 to sex offenders who have traveled in interstate commerce, the regulation contained in § 2250 must be contemplated within Congress's traditional authority over interstate commerce. If the regulation lies beyond the traditional limits attached to this power, § 2250 cannot be up held as constitutional.

Many of the courts to uphold § 2250 as a valid exercise of Congress's traditional power over interstate commerce have relied on the language in the second category of Lopez: "persons in interstate commerce." Lopez, 514 U.S. at 558; see United States v. Pena, ____ F. Supp. 2d ____, 2008 WL 4642167 (W.D. Tex. Oct. 20, 2008). These courts have interpreted the phrase "persons in interstate commerce" to give Congress plenary jurisdiction over a person once he has traveled in intestate commerce. See United States v. Husted, 2007 U.S. Dist. Lexis 56662, *8 (W.D. Okla. 2007). This reliance on the literal language of the second category is unfounded and radically departs from the traditional and still governing ability of Congress to attach regulations upon

the travel of persons and things in interstate commerce.  See supra
Part III.B.  When § 2250 is analyzed against the traditionally
understood and accepted power of Congress to regulate persons and
things in interstate commerce, it is clear that § 2250 exceeds the
power vested in Congress by the Commerce Clause.

When a statute is challenged as exceeding Congress's Commerce
Clause power, the analysis focuses first on the precise activity
Congress is seeking to regulate, and second whether its power over
commerce contemplates such a regulation.  Lopez, 514 U.S. at 550-
51; Morrison, 529 U.S. at 608-10.  Once these two issues are
framed, the Court can accurately assess whether the regulation
enacted exceeds the power vested in Congress by Article 1, section
8.

### 1. The Regulated Activity

By its terms § 2250 is addressed to a situation with three
characteristics: 1) a person who is required to register under
SORNA, 2) who travels in interstate or foreign commerce, and 3) who
knowingly fails to register.  18 U.S.C. § 2250(a)(2)(B).  Section
2250 does not criminalize interstate travel for the purpose of
avoiding registration, nor does it criminalize failing to register
as the sex offender is in the act of traveling in interstate
commerce.  The jurisdictional element of "interstate travel" is an
indefinite requirement that only requires a person to have traveled
in interstate commerce.  The purpose attached to the travel is left
unstated and is utterly divorced from the activity being regulated:

knowingly failing to register as a sex offender.  See Husted, 2007 U.S. Dist. Lexis 56662, *8 (W.D. Okla. 2007) ("[T]he activity proscribed by Section 2250 is not an individual's travel for an illicit purpose but a sex offender's failure to register or update a prior registration.").

Therefore, the regulation is not aimed at the individual's travel, nor is it directed at protecting the instrumentalities of interstate commerce.  It is simply an administrative regulation of persons who are supposed to register under § 16913.  Smith v. Doe, 538 U.S. 84, 96 (2003) (holding that Alaska's sex offender registry was non-punitive and implemented to be civil and administrative program).  The regulated activity, the failure to register, is a completely local, non-economic activity, similar to possessing a gun in a school zone and gender-motivated violence.[18]  See Lopez, 514 U.S. at 567;  Morrison, 529 U.S. at 619.

## 2. Congress's Power

Congress's power to regulate interstate commerce is plenary. That is, there is no part of interstate commerce over which Congress does not have authority.  Gibbons v. Ogden, 22 U.S. (9

---

[18] It is likely that § 2250's similarity with the regulations at issue in Lopez and Morrison as non-economic, local activities that has led courts to analyze whether it has a substantial affect on interstate commerce.  While § 2250 is very similar to those regulations, Congress has not denoted that it is regulating the registration of sex offenders for its substantial effect on interstate commerce.  It has chosen a different vehicle of regulation.  18 U.S.C. § 2250 ("travel[] in interstate or foreign commerce").

Wheat.) at 193-94; Shreveport Rate Cases, 234 U.S. at 350 ("It is of the essence of this power that, where it exists, it dominates."). Its power to regulate does, however, have two limits. First, the Commerce Clause is only a limited grant of power, in that there is some commerce over which Congress does not have authority, namely intrastate commerce. United States v. Dewitt, 76 U.S. (9 Wall.) 41, 44 (1824) (noting "[t]he express grant of power to regulate commerce among the states has always been understood as limited by its terms"); Maryland v. Wirtz, 392 U.S. 183, 196 (1968) ("The subject of federal power is still commerce and not all commerce, but commerce among the states."). Second, Congress's exercise of authority is channeled into different forms that denote the precise breadth of the power it has and may employ. Ballinger, 395 F.3d at 1233. In this latter regard, Congress has certain statutory terms of art it uses to communicate the precise form its power is taking. Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 115 (2001); Ballinger, 395 F.3d at 1231 ("Congress has at its disposal a specialized set of linguistic tools that enable it to clearly express just what type of commerce authority it is asserting.").

If a statute uses the term "affecting commerce," then Congress has chosen to use the full breadth of its power under the Commerce Clause. Citizens Bank v. Alafabco, Inc., 539 U.S. 52, 56 (2003) ("[A]ffecting commerce" is a "[term] of art that ordinarily signal[s] the broadest permissible exercise of Congress' Commerce

56

Clause power."). Statutes using the term "affecting commerce" fall within the third category in <u>Lopez</u>. <u>See</u> <u>Morrison</u>, 529 U.S. at 609.

When Congress chooses to use the term "in commerce," or some derivation thereof, it is communicating its choice to use the traditional and more circumscribed form of its Commerce Clause power articulated in the first two <u>Lopez</u> categories. <u>See</u> <u>Am. Building Maintenance</u>, 422 U.S. at 280 (noting that "the phrase 'engaged in commerce' had long since become a term of art, indicating a limited assertion of federal jurisdiction"); <u>Circuit City Stores</u>, 532 U.S. at 115-16 (noting that the words "in commerce" are "understood to have a more limited reach" that "we have not read as expressing congressional intent to regulate the outer limits of [its] authority under the Commerce Clause") (citations omitted). Thus, the jurisdictional element necessary to uphold legislation regulating activities "in commerce" "cannot be satisfied merely by showing that the [activities] affect commerce." <u>Am. Building Maintenance</u>, 422 U.S. at 276; <u>see also</u> <u>FTC v. Buente Bros.</u>, 312 U.S. 349 (1941) (upholding the distinct meaning given to each phrase).

In <u>United States v. Ballinger</u>, the Eleventh Circuit, sitting <u>en banc</u>, engaged in a lengthy study of Congress's use of the terms "affecting commerce" and "in commerce" and the Supreme Court's interpretation of each. 395 F.3d at 1230-33. It noted that "[f]or more than 175 years of Commerce Clause precedent, this much has been clear: 'Within the flow of commerce' denotes movement or [sic]

people or things across interstate borders." Id. at 1232. Ultimately, the Court concluded "that the jurisdictional language 'in commerce' invokes Congress' authority to regulate only the channels within which people and goods move through the flow of commerce, as well as the instrumentalities used to facilitate that movement--that is, the Lopez 1 and Lopez 2 powers." Id. at 1233. Exclusive use of the term "in commerce" "stops well short of invoking Congress' Lopez 3 power to regulate activities outside the channels and instrumentalities of commerce that nonetheless substantially 'affect' commerce." Id.

The jurisdictional language Congress chose to use in § 2250 is addressed to sex offenders traveling "in commerce." 18 U.S.C. § 2250(a)(1)(B). Nowhere in the statute is the term "affecting commerce" used. In contrast to those courts that have analyzed the statute to determine whether registration of sex offenders has a substantial impact on interstate commerce under the third Lopez category, the Court will limit its analysis to the tests traditionally used for statutes invoking Congress's power under the first two Lopez categories.[19] See Buente Bros., 312 U.S. at 351-52.

Numerous courts have addressed the constitutionality of § 2250 and upheld it under the second category of Lopez. See, e.g., Pena, ____ F. Supp. 2d ____, 2008 WL 4642167; United States v. Nam Van

---

[19] Many of the Courts upholding § 2250 have relied on the aggregate effect of registering sexual offenders. Such reliance is neither permitted by virtue of Lopez or the language used in the statute.

Hoang, 2008 WL 4610249 (M.D. La. Oct. 16, 2008); United States v. Crum, 2008 WL 4542408 (W.D. Wash. Oct. 8, 2008).  In upholding § 2250, the courts reason that because the sex offender must have traveled in interstate or foreign commerce to fall under the statute, it is axiomatic that he is a "person in interstate commerce" who Congress may regulate.  E.g., Husted, 2007 U.S. Dist. Lexis 56662, *8 (W.D. Okla. 2007); Crum, 2008 WL 4542408, *8 ("Section 2250(a) explicitly regulates 'persons . . . in interstate commerce,' Lopez, 514 U.S. at 558, and therefore is a valid exercise of Congress's Commerce Clause power under the second Lopez prong.") (citation omitted).

     At first blush, this seems perfectly sensible, but its logic rests on a faulty assumption concerning Lopez and its articulation of the three categories of activity that Congress may regulate. The cornerstone of this faulty assumption is the courts' complete reliance on the oft-quoted formula "persons or things in interstate commerce, even though the threat may come only from intrastate activities." Lopez, 514 U.S. at 558.  Indeed, the Lopez categories' deception lies in their simplicity.

     The courts upholding § 2250 necessarily, though not explicitly, read Lopez as articulating a new power given to Congress by subscribing undue weight to its broad and unqualified articulation of the phrase, "persons and things in interstate commerce."  In effect, these cases read Lopez's articulation as the Commerce Clause itself, or as a statute written by the Supreme

Court for Congress to use and apply.  To read Lopez's articulation as anything more than a convenient summary is to ignore its context and holding, the Commerce Clause itself, and the rich body of law that has developed over the past two centuries concerning the Commerce Clause.  By articulating the categories in Lopez, the Supreme Court did not create new powers for Congress beyond those it traditionally enjoyed.  Bishop, 66 F.3d at 592 (Becker, J., concurring in part and dissenting in part).  It simply formulated a convenient rhetorical tool for lower courts and practitioners alike to quickly identify the historically accepted forms of Congress's Commerce Clause power.

The Lopez opinion did not address or alter the traditional power of Congress to regulate persons and things in interstate commerce.  It simply noted that this power exists, gave examples of it, and reaffirmed that it constitutes part of the traditional understanding of the Commerce Clause consistently applied over the past century.  See Lopez, 514 U.S. at 559.  The opinion went on to analyze and discuss the altogether separate third category.  Thus, the categories' prominent placement in Lopez and repeated citation in Morrison and other Commerce Clause cases did not usher in a new age of radical commerce clause jurisprudence.

The first Lopez category can only be understood through reference to the cases it cited.  A careful study of the Court's citation of Darby and Heart of Atlanta Motel, particularly the latter's further citation of Caminetti, establishes the precise

meaning of the first <u>Lopez</u> category.  In those cases, the cited
discussion was filled with references to cases where Congress
regulated the channels of interstate commerce by prohibiting
certain persons with a proscribed intent or article from traveling
on those channels.  <u>Heart of Atlanta Motel</u>, 379 U.S. at 256-57
(citing <u>The Lottery Case</u>, 188 U.S. at 321; <u>Hoke</u>, 227 U.S. at 320;
<u>Brooks</u>, 267 U.S. at 432) (further citations omitted); <u>Caminetti</u>,
242 U.S. at 491 (noting "this act . . . seeks to reach and punish
the movement in interstate commerce of women and girls with a view
to the accomplishment of the unlawful purposes prohibited").  An
imprecise summation of these cases would understandably focus on
the effect of the congressional regulation on the actor.  In that
way, it would appear that Congress is regulating lottery tickets or
young women themselves.  But in truth, it is regulating the
channels of interstate commerce by prohibiting such persons or
articles from traveling on them, and, in that way, it is defeating
the local evil.  <u>Hoke</u>, 227 U.S. at 322 (noting "Congress may
prohibit its transportation between the states, and by that means
defeat the motive and evils of its manufacture.").

Thus, when Congress criminalizes the carriage of certain items
or persons in interstate travel, which is what we know the Supreme
Court meant by the cases it cited in support of the first <u>Lopez</u>
category, it is regulating the travel of the item or the person
across the channels of interstate commerce.  It is not regulating
the local activity the person engaged in once he ceased traveling

in interstate commerce; it is only concerned with the person or thing's travel. Patton, 451 F.3d at 621; Rybar, 103 F.3d at 288-89 (Alito, J., dissenting). It is a mistake to take those instances cited as congressional regulation of the channels of interstate commerce and include them in the second Lopez category regulating "instrumentalities of interstate commerce, or persons or things in interstate commerce." The second category has a completely distinct meaning apart from the first.

The second Lopez category concerns Congress's power to regulate and protect the instrumentalities of interstate commerce, i.e., "the means of conveying people and goods across state lines, such as airplanes and trains." Rybar, 103 F.3d at 288-89 (Alito, J., dissenting). The additional language "persons or things in interstate commerce, even though the threat may come only from intrastate activities" must be read in conjunction with the subject of the second category: the instrumentalities of interstate commerce. Id. (noting that the second category "also reaches threats to people and goods traveling in interstate commerce, such as the theft of goods moving interstate and the setting of rates that could affect interstate trade"). That language cannot be read, as it too often is, to constitute a fourth Lopez category. When that language is taken out of context that is precisely the effect courts have given it. Husted, 2007 U.S. Dist. Lexis 56662, *9-10; Mason, 510 F. Supp. 2d at 932; Reynolds, Rulings and Resistance, supra at 1263-80; 1289-99.

Congress's power to protect the instrumentalities of interstate commerce is not at issue in § 2250. Thus, the constitutionality of § 2250 turns on whether it falls within the first Lopez category. Before engaging in this analysis, the Court must first determine whether the traditional standard applied to goods and persons "in commerce" discussed in The Lottery Case and others above should be applied to § 2250, or whether the Court should, as the Government urges, apply the "minimal nexus" test employed in United States v. Scarborough, 431 U.S. 563 (1977), to a defendant's travel under § 2250.

### 3. The Outliers

In Scarborough the Supreme Court held that in order to satisfy the jurisdictional element of "in or affecting interstate commerce" the Government need only establish that the firearm previously traveled in interstate commerce. Id. at 575. In Scarborough the Court described the one time passing of the firearm across state lines as a "miminal nexus" with interstate commerce. Under this "minimal nexus," the firearm's interstate travel does not have to come through the efforts of the felon charged with possessing it. Id. 575-76. In this Circuit, the minimal nexus test from Scarborough has been faithfully applied to felon in possession cases and extended to federal statutes concerning carjacking. E.g., United States v. McAllister, 77 F.3d 387, 389 (11th Cir. 1996) (applying Scarborough to 18 U.S.C. § 922(g), the successor statute to § 1202(a)); United States v. Williams, 51 F.3d 1004,

1008-09 (11th Cir. 1995) (upholding a conviction under the federal carjacking statute, 18 U.S.C. § 2119, on a showing that the automobile had at one time moved in interstate commerce).[20] Another line of cases uses the same "minimal nexus" language as _Scarborough_, but those cases are distinguishable because they are analyzed under the regulation's substantial effect on interstate commerce, not the article's movement in commerce.[21]

### a. _Ballinger_

There is one case in this Circuit that loosely portends

---

[20] In _Williams_, 51 F.3d at 1008-09, the Court did not explicitly state it was applying _Scarborough_ to automobiles. Rather, it adopted the reasoning of two cases that relied on _Scarborough_. _Id._ at 1008-09 (relying on _United States v. Martinez_, 49 F.3d 1398, 1400-01 n.3 (9th Cir. 1995) (adopting _Scarborough_), and _United States v. Johnson_, 22 F.3d 106, 108-09 (6th Cir. 1994) (adopting _Scarborough_)).

[21] The other line of cases to use and apply the "minimal nexus" language concern the Hobbs Act, 18 U.S.C. § 1951, and 18 U.S.C. § 1028(c)(3)(A), which criminalizes possession with intent to use false identification documents. Both of these statutes use the jurisdictional language "in or affecting commerce" and have been sustained based on the criminal activities' minimal connection with interstate commerce. _United States v. Klopf_, 423 F.3d 1228, 1237-39 (11th Cir. 2005) (upholding the constitutionality of 18 U.S.C. § 1028(c)(3)(A) because of the regulated activity's minimal effect with interstate commerce); _United States v. Castleberry_, 116 F.3d 1384, 1387 (11th Cir. 1997) (upholding the Hobbs Act, 18 U.S.C. § 1951 (interference with commerce by threats of violence), against a Commerce Clause challenge based on the minimal nexus with interstate commerce). Prior to _Scarborough_ the Supreme Court upheld § 301 of the Food, Drug, and Cosmetic Act of 1938, 52 Stat. 1042, which prohibited the sale of adulterated drugs that at one time traveled in interstate commerce as a valid exercise of Congress's Commerce Clause power. _United States v. Sullivan_, 332 U.S. 689, 698 (1948) (upholding "the constitutional power of Congress under the commerce clause to regulate the branding of articles that have completed an interstate shipment and are being held for future sales in purely local or intrastate commerce").

applying Scarborough beyond the regulation of an article in commerce after it has ceased being passed or possessed in interstate commerce: United States v. Ballinger, 395 F.3d 1218 (11th Cir. 2005) (en banc).  In Ballinger, the Eleventh Circuit upheld the constitutionality 18 U.S.C. § 247, which criminalizes, inter alia, the destruction of property because of its religious character.   In § 247, Congress limited the actions it was prohibiting to those where "the offense is in or affects interstate or foreign commerce."  18 U.S.C. § 247(b).

In Ballinger, the defendant had traveled across several states to burn down several churches.  He challenged the constitutionality of § 247, and the Eleventh Circuit upheld the statute under Congress's power under the first two Lopez categories.   It concluded that "Congress' commerce authority includes the power to punish a church arsonist who uses the channels and instrumentalities of interstate commerce to commit his offenses." Ballinger, 395 F.3d at 1230; see also id. at 1241 ("[T]ravel in interstate commerce just prior to and for the purpose of destroying a church places the offense within the reach of § 247.") (emphasis added).

The Court then addressed "whether § 247 is properly interpreted as prohibiting the use of the channels and instrumentalities of commerce to commit church arson, or whether the statute merely proscribes arson in which the burning of the church itself occurs in commerce or affects commerce."  Id. at

1231.  Ballinger argued that § 247 should be read as eliminating any consideration of travel prior to and after the arson.  Under his reading, § 247 only proscribed "those offenses in which the precise meeting of flame and church occurs in commerce--not those in which the offender relies on the channels and instrumentalities of commerce to carry out the offense."  Id. at 1230-31.  The court went to great lengths through section III of the majority opinion to establish that "in commerce" does not mean that the actual harm, the arson, must have taken place in interstate commerce.  Id. at 1231-45.  In rejecting Ballinger's reading, it drew support from Scarborough for the proposition that "travel in interstate commerce just prior to and for the purpose of destroying a church places the offense within the reach of § 247."  Id. at 1241 (emphasis added).  After taking due account of this Circuit's application of Scarborough, the court "read § 247 as requiring that the offender utilize the channels or instrumentalities of interstate commerce in carrying out his crime--not that the ultimate actus reus of destroying the church itself somehow occur in commerce."  Id. at 1242.

Ballinger's reliance on Scarborough was not for the purpose of establishing that a minimal nexus test also applied to persons who once crossed state lines.  Ballinger, 395 F.3d at 1241 ("In interpreting § 247, we need look no farther than the methodology employed by the Supreme Court in Scarborough to reach the conclusion that § 247 cannot be interpreted as requiring the

ultimate act of destruction occur in commerce."). Had the "minimal nexus" test applied to Ballinger's person, it would have meant that once he crossed state lines, regardless of the purpose and the timing of such travel, Congress was free to regulate whatever purely local conduct that he choose to engage in. This would have brought Ballinger under § 247 if he burnt down a church in his home state with the proscribed intent, so long as at sometime in his past he once crossed state lines. This logical application of _Scarborough_'s minimal nexus between Ballinger's person and interstate commerce was not part of the court's analysis and holding. Instead, it focused on Ballinger's repeated "travel in interstate commerce just prior to and for the purpose of destroying a church." _Id._ at 1241 (emphasis added).[22] Such prohibited travel is precisely the sort of regulation that Congress traditionally imposes upon the channels of interstate commerce. The Lottery Case, 188 U.S. at 357; _Caminetti_, 242 U.S. at 491.

Thus, _Ballinger_'s citation of and reliance upon _Scarborough_ was for the limited purpose of illustrating the fact that the statute's language "cannot be interpreted as requiring the ultimate act of destruction occur in commerce." _Id._ at 1241. The _Ballinger_ opinion does not extend _Scarborough_'s "minimal nexus" test to a

---

[22]   See also _Ballinger_, 395 F.3d at 1228 ("Congress acted well within the bounds of its commerce power when it enacted legislation to prevent conduct like Ballinger's, which entailed weeks of travel in a van (an instrumentality of commerce) along interstate highways (a channel of commerce) and at least six separate interstate border crossings, all for the specific purpose of spreading the evil of church burning through four different states.").

defendant's person by holding that once he moves in interstate commerce Congress is free to regulate him.

b. Continued Application of *Scarborough*

Apart from the Eleventh Circuit's limited application of the "minimal nexus" principle, Scarborough is a Supreme Court case, and this Court must address the Government's argument that Scarborough and its "minimal nexus" test should be applied to § 2250. In this Circuit, the "minimal nexus" test has only been applied beyond the context of felons in possession of a firearm in one case: United States v. Williams, 51 F.3d 1004. In Williams, the court upheld the constitutionality of the federal carjacking statute, 18 U.S.C. § 2119. While the Court in Williams did not explicitly apply Scarborough's "minimal nexus" test to the statute, it adopted the holdings of several other Circuit courts that applied Scarborough to § 2119. Id. at 1008-09. In those cases the "minimal nexus" requirement was not placed upon the travel of the person committing the offense. Instead, the courts looked to the one-time interstate travel of the automobile that was forcibly taken. Id. at 1008-09. This follows the felon-in-possession cases, where courts do not look to a defendant's sometime travel in interstate commerce, but the firearm's one-time travel across state lines.

In contrast, applying Scarborough to § 2250 would attach the "minimal nexus" to a defendant's person, because the statue speaks in reference only to his travel, 18 U.S.C. § 2250(a)(2)(B), and no article of commerce is implicated that could give rise to federal

68

jurisdiction.  This means the penalty for knowingly failing to register as a sex offender attaches to a defendant, regardless of when he traveled across state lines or for what purpose.  <u>Husted</u>, 2007 U.S. Dist. Lexis 56662, *9-10 (enforcing § 2250 "without regard to the date of interstate travel").  It is enough that at some distant time, a defendant crossed state lines.

This is an absurd and exceedingly dangerous proposition.  It is absurd because it breaks with two centuries of cases defining Congress's power under the Commerce Clause to pass criminal regulations.  All of the seminal cases discussed in the first section of this Order, from <u>The Lottery Case</u> to <u>Lopez</u>, affirm this principle:  When Congress regulates conduct based on the actor or item's movement in interstate commerce, it is not regulating the local activity, but prohibiting a person's use of the channels of interstate commerce for certain harmful purposes.  <u>E.g.</u>, <u>The Lottery Case</u>, 188 U.S. at 358; <u>Hoke</u>, 227 U.S. at 323; <u>Brooks</u>, 267 U.S. at 437; <u>Caminetti</u>, 242 U.S. at 491 (noting Congress's power "seeks to reach and punish the movement in interstate commerce").  Here, no travel is regulated, only a knowing failure to register as required by SORNA; the defendant's travel is divorced from the regulated activity.  It is absurd to think that such a regulation falls within the same reasoning as <u>The Lottery Case</u> and <u>Caminetti</u>, that is, the cases traditionally understood to encompass the first <u>Lopez</u> category.

Extending <u>Scarborough</u>'s "minimal nexus" test to a defendant's

person is an exceedingly dangerous proposition because it undermines our deeply entrenched principles of federalism and renders the traditional limitations on federal power illusory. By extending Scarborough to uphold § 2250, Congress would no longer be limited to regulating the travel of sex offenders across the channels of interstate commerce or their potential threat to the instrumentalities of interstate commerce, or their engagement in activities that substantially affect interstate commerce. Rather, its regulation would reach each defendant in his person, simply because he at some time crossed state lines. In this case, the crossing of state lines was not for an any illicit purpose. Certainly none is alleged in the Indictment or required by § 2250. In fact, the Government indicates that Defendant traveled to Florida to be with his mother, not to avoid any registration requirement in his former home, New York. DE 23, p. 2. When Defendant did cross state lines, his intents and purposes for traveling were not regulated, and, therefore, he was as free as any man is to visit his mother in another state. The fact that he has traveled to see his mother, as a free citizen unencumbered by the law, does not and cannot give rise to a later regulation of his person: as no regulation attached to his travel, Congress is not free to place one on him after he has rested. Caminetti, 242 U.S. at 491.

Section § 2250's compulsory regulation based on a defendant's unencumbered travel across state lines eliminates his choice to

engage in behavior the federal government is empowered to regulate. Defendant Edward Myers is a human being and an American citizen; as such he is endowed with the same freedom to travel all Americans enjoy. Saenz v. Roe, 526 U.S. 489, 500-01 (1999); see also Charles E. Rice, The Winning Side 49-55 (noting the right to travel and the freedoms all citizens have under the Constitution). While he bears the badge of having committed a heinous act of sexual violence, his connection to interstate commerce, like all human beings, is finite and limited to his choice to engage in such. Howard v. Ill. Cent. R.R. Co., 207 U.S. 463, 491-92 (1908). Thus, Congress may only regulate him through the Commerce Clause to the extent that he chooses to engage in interstate commerce, either by traveling in interstate commerce, purchasing goods that have traveled in interstate commerce, or engaging in action that, in the aggregate, has a substantial effect on interstate commerce. Application of the "minimal nexus" test to sex offenders would be an unbearable exception to this principle. And while sex offenders may be the least sympathetic lot of society, the law does not recognize a distinction between the everyman's travel and a sex offender's travel for the same purpose. An exception for them today may bring tomorrow's application to all. Korematsu v. United States, 323 U.S. 214, 246 (Jackson, J., dissenting).

The danger of applying Scarborough to a person's travel in § 2250, is readily apparent, but taken one step further, it becomes all the more so. Whether it always seems honored or not, the

Supreme Court has consistently begun the analysis of its seminal Commerce Clause rulings with this principle: the Commerce Clause has limits.   See, e.g., Morrison, 529 U.S. at 607; Lopez, 514 U.S. at 552, 556-57; Five Gambling Devices, 346 U.S. at 446 (plurality opinion); Shreveport Rate Cases, 234 U.S. at 350; Kidd v. Pearson, 128 U.S. 1, 15-16 (1888); The Daniel Ball, 77 U.S. (10 Wall.) 557, 563 (1870); Veazie v. Moor, 55 U.S. (14 How.) 568, 573 (1852); Gibbons v. Ogden, 22 U.S. (9 Wheat.) at 189.   Faithful application of Scarborough to every criminal statute where a person's travel is invoked as a jurisdictional element would wipe away these limits. In doing so, many of the maxims that undergird our Commerce Clause jurisprudence and inform the limitations that courts place on Congress's Commerce Clause power are rendered meaningless: "The Commerce Clause is a limited grant of power." Window dressing. "Congress cannot punish felonies generally."   Hogwash. "No one disputes the proposition that the Constitution created a Federal Government of limited powers."   The remnant of a by-gone era.

Faithful application of Scarborough's minimal nexus to a person's travel would mean "there would be virtually no limit to the federal power and for all practical purposes we should have a completely centralized government."   Lopez, 514 U.S. at 555. Upholding the jurisdictional link of a person having traveled at sometime in interstate commerce would allow "the Federal Government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of

commercial activities, the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory." Id. at 577 (Kennedy, J., concurring). This cannot be permitted.

c. Limiting the Application of *Scarborough*

It is not enough to stand as a robed Cassandra and dismiss any application of Scarborough to § 2250 on the basis that it is absurd and the first step on the slippery slope described above.[23] Many courts may have questioned the wisdom of applying the holding in Wickard v. Filburn after it was handed down, but that alone does not empower lower courts to ignore such a holding. When a court confronts a precedent that falls outside the holdings and reasoning applied in other seminal cases, it must determine whether the precedent's logic requires "narrowing or readjustment in light of relevant distinctions that the new fact situation brings to the fore" or if "its logic is fundamentally flawed, and so deserves to be limited to the facts that begot it." Hein v. Freedom From Religion Foundation, Inc., 551 U.S. _____, 127 S.Ct. 2553, 2579 (2007) (Scalia, J., concurring in the judgment). Here, there are several reasons beyond those cited above that caution against applying Scarborough beyond those binding cases that have already adopted its "minimal nexus" test, especially with reference to § 2250.

_____

[23] Homer, The Iliad bk. X.; Aenied 2.323 (Dryden Translation) (detailing Cassandra's plea, to no avail, that the Trojans not accept the Greeks' fateful gift).

First, as a practical matter, the jurisdictional language in Scarborough and the federal carjacking statute, 18 U.S.C. § 2119, is different than that at issue in § 2250. The jurisdictional language in the statutes at issue in those cases was "in or affecting commerce." 18 U.S.C. App. § 1202(a) (1970); 18 U.S.C. § 922(g); 18 U.S.C. 2119. Here, the jurisdictional language is limited to a person who "travels in interstate or foreign commerce." 18 U.S.C. § 2250(a)(2)(B).

Second, Scarborough does not fit within the paradigm constructed by Lopez. See Patton, 451 F.3d at 634 (noting that the Scarborough precedent does not fit within the Lopez categories); Newton, Felons, Firearms, and Federalism, supra at 679-82 (noting the legal fiction of Scarborough does not survive under Lopez). Scarborough departs from the traditional application and understanding of Congress's Commerce Clause power. It neither limits itself to criminalizing the travel of convicted felons who are carrying a firearm through the channels of interstate commerce or seeking to obtain one through the means of interstate commerce, nor does it criminalize the possession of a firearm by a convicted felon based on its substantial effect on interstate commerce. United States v. Chesney, 86 F.3d 564, 578 (6th Cir. 1996) (Batchelder, J., concurring). Because Scarborough falls outside of the Lopez categories and the traditional cases that it listed as composing the first two categories, many appellate courts have questioned the continued application of Scarborough, while still

74

faithfully applying its holding to certain limited cases.[24]

Third, the holding of <u>Scarborough</u> and the sufficiency of its "minimal nexus" test was recently called into question by the Supreme Court in <u>United States v. Jones</u>, 529 U.S. 848 (2000). In <u>Jones</u>, the Government argued that a private residence had a "minimal nexus" with interstate commerce simply because some of its parts previously traveled in interstate commerce. The Court rejected this argument, and stated: "Practically every building in our cities, towns, and rural areas is constructed with supplies that have moved in interstate commerce, served by utilities that have an interstate connection, financed or insured by enterprises that do business across state lines, or bears some other trace of interstate commerce." <u>Id.</u> at 857. Logically, this would mean that, "hardly a building in the land would fall outside the federal statute's domain." <u>Id.</u> With <u>Jones</u> rejecting a reading of the term "in commerce" to encompass the prior travel of parts in interstate commerce, this Court cannot in good faith further apply <u>Scarborough</u> to encompass a sex offender's movement in interstate commerce at some previous time. There is little to distinguish the logic that was rejected by the Supreme Court in <u>Jones</u> with the Government's

_____

[24] <u>See, e.g.</u>, <u>United States v. Cortes</u>, 299 F.3d 1030, 1037 n.2 (9th Cir. 2002); <u>United States v. Kirk</u>, 105 F.3d 997, 1016 n.25 (5th Cir. 1997) (en banc) (opinion of Jones, J.); <u>United States v. Kuban</u>, 94 F.3d 971, 973 n.4 (5th Cir. 1996); <u>Bishop</u>, 66 F.3d at 593-97 & n.13 (3d Cir. 1995) (Becker, J., concurring in part and dissenting in part) (criticizing the majority for relying on <u>Scarborough</u>, which "was devoid of any Commerce Clause analysis").

position regarding § 2250.   Just as practically all building materials have at some time crossed state lines, so, too, have most Americans.

The Court cannot speculate as to the Supreme Court's reasoning for continually denying certiorari on cases urging it to revisit Scarborough. Humphreys v. United States, 128 Sct. 47 (2007); Scott v. United States, 122 Sct. 1182 (2002); McAllister v. United States, 117 Sct. 262 (1996).   However, the force of the reasoning detailed above, coupled with Scarborough's scarce application in this Circuit and the Ballinger court's limited reliance on it for illustrative purposes only, favor limiting Scarborough to the facts that begot it and only applying it in such cases as the Supreme Court and Eleventh Circuit has previously mandated.   Hein, 551 U.S. ____, 127 S.Ct. at 2579 (Scalia, J., concurring in the judgment); see also Patton, 451 F.3d at 634-36 (collecting cases noting the same).   Thus, the Court will not apply Scarborough and its "minimal nexus" test to  Defendant's travel across state lines for purposes of § 2250.

### 4. Section 2250 is Unconstitutional

Returning to the precise question at issue, the constitutionality of § 2250, any congressional act under the Commerce Clause must fall within the categories in Lopez.   They embody the permissible avenues and forms that congressional action under the Commerce Clause may take.   Because § 2250 uses the language "in commerce," the third Lopez category is not implicated.

76

Am. Building Maintenance, 422 U.S. at 276.  As discussed in greater detail above, the first Lopez category entails regulation of the channels of interstate commerce.  Lopez, 514 U.S. at 558.  It is through Congress's power to regulate the channels of interstate commerce that Congress has the power to prohibit the transportation of lottery tickets between the states, or to prohibit bringing young women across state lines for immoral purposes, or to prohibit bringing a stolen automobile from one state to another.  In these cases, Congress's regulation is focused on the person's movement through the channels of interstate commerce, not the act that takes place once they have arrived.

In contrast to the principle embodied in the first Lopez category, § 2250 only requires that the person "travel[] in interstate or foreign commerce."  18 U.S.C. § 2250(a)(2)(B).  In this way, the interstate travel is not the criminal act; in fact, it is divorced from the criminal act of knowingly failing to register as a sex offender.  Id. § 2250(a)(3).  The person charged under § 2250 need not travel in interstate commerce for the purpose of avoiding registering as a sex offender, an act Congress could prohibit.  18 U.S.C. § 1073 (criminalizing travel in interstate commerce to avoid prosecution).  Although the distinction may be slight, it is of great constitutional importance.  Congress may regulate the channels of interstate commerce by criminalizing the travel of those who carry a proscribed intent or article.  However, it may not attach regulations on a person simply because he has

once innocently availed himself of his constitutional right to travel through the channels of interstate commerce. Thus, § 2250 cannot be sustained under the first Lopez category as a regulation of the channels of interstate commerce.

Under the second Lopez category, "Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." Lopez, 514 U.S. at 558. The cases and statutes cited in support of this proposition all concerned Congress's ability to regulate an instrumentality of interstate commerce by setting the rates for railroad carriers. Id. (citing Shreveport Rate Cases, 234 U.S. 342; Southern R.R. Co., 222 U.S. 20). They also entailed criminalizing certain threats to these instrumentalities, including aircraft. Id. (citing Perez, 402 U.S. at 150 (citing 18 U.S.C. §§ 32, 659). This category, as evidenced by the cases cited as exemplars, consists of Congress's power over the instrumentalities of interstate commerce, like planes and trains. Section 2250 does not concern such instrumentalities of interstate commerce or the carriage of persons on such instrumentalities. Therefore, § 2250 does not fall within the second Lopez category.

Despite this, most of the courts sustaining § 2250 have seized on the language in the second Lopez category, "persons or things in interstate commerce, even though the threat may come only from intrastate activities." E.g., Thomas, 534 F. Supp. 2d at 920

(upholding § 2250 under second category).   There is nothing to suggest that the language "persons or things in interstate commerce, even though the threat may come only from intrastate activities" was meant to be read apart from the rest of the category explicitly referring to regulation of instrumentalities of interstate commerce.   When the  text is read with the rest of second category's language and citations, it is clear that Congress's power over the instrumentalities of interstate commerce "reaches threats to people and goods traveling in interstate commerce, such as the theft of goods moving interstate." Rybar, 103 F.3d at 598 (Alito, J., dissenting).   In this way, Congress is empowered to protect the persons and "things that the instrumentalities are moving." Patton, 451 F.3d at 622.   The formula "persons or things in interstate commerce, even though the threat may come only from intrastate activities" is addressed to Congress's power to regulate and protect such persons from threats while traveling in interstate commerce.   It involves things "actually being moved in interstate commerce, not all people and things that have ever moved across state lines." Id. at 622.

The courts upholding § 2250 on this ground have relied on the text "persons or things in interstate commerce, even though the threat may come only from intrastate activities" without appreciating either its context or meaning, and with such reliance they have impermissibly extended the limits ascribed to Congress's Commerce Clause power.   They have detached the text from its

context and in this way created a fourth, illegitimate <u>Lopez</u> category.  This misplaced reliance on that language is by large measure what has sustained so many challenges to this statue. There is no basis for a fourth <u>Lopez</u> category.  It is beyond the language of <u>Lopez</u>, the Supreme Court precedent limiting Congress's Commerce Clause power, and, most importantly, the Constitution.

Even if the text of <u>Lopez</u> meant something other than what this Court has ascribed to it, it could never mean that once a person has traveled across state lines Congress is free to attach any regulation to him it deems fit.  Such a reading would mean Congress has greater power under the second <u>Lopez</u> category than it does under the third.  <u>Raich</u>, 545 U.S. at 34 (Scalia, J., concurring in the judgment).  If through use of the phrase "persons or things in interstate commerce" Congress could now regulate a person based on a single instance of travel years prior to the charged offense, then <u>Lopez</u> would not be celebrated in any sense as "revolutionary" for recognizing the limits on Congress's power.  Rather, it would be remembered for endorsing Leviathan's reach far beyond the lunch counter at Ollie's Barbecue and the back forty of Filburn's farm. <u>See</u> <u>Katzenbach v. McClung</u>, 379 U.S. 294 (1964); <u>Wickard v. Filburn</u>, 317 U.S. 111 (1942).

Section 2250 read this way is an ends-justify-the-means remedial statute.  Imposing criminal penalties for failing to register surely would aid in the suppression of sexual and violent crime; however, the enumerated powers of Congress are simply not

broad enough to encompass this regulation. Redressing and preventing sexual and violent crime, "the suppression of which has always been the prime object of the States' police power," Morrison, 529 U.S. at 615, must be left to the States.

## V. Conclusion

While providing Congress with the power to regulate sex offenders in the manner attempted by SORNA would admittedly aid Congress in its goal to protect the public, it is not has not among Congress's enumerated powers. Congress has never been accorded the general police power it has sought to exercise in SORNA. See Lopez, 514 U.S. 596-98 (Thomas, J., concurring); Cohens v. Virginia, 19 U.S. (6 Wheat.) at 426. Cases are legion that note that the federal government does not have the residual power held by the states. E.g., Lopez, 514 U.S. at 584-602 (Thomas, J., concurring).

With statutes like those at issue here, Congress's desire to aid in the protection of society against sexual predators is understandable and laudable. However, "the powers of the legislature are defined, and limited; and that those limits may not be mistaken, or forgotten, the constitution is written." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 175 (1803). Specifically, the grant of power made under the Commerce Clause is limited. Lopez, 514 U.S. at 552-553 (citing Gibbons v. Ogden, 22 U.S. (9 Wheat.) at 189-95). Therefore, the statutes challenged herein cannot be upheld. Section 16913 transgresses entirely the limits set on

Congress by the Commerce Clause.  It cannot be defended except by adulteration of the text of the Constitution and controlling caselaw.  Section 2250 also exceeds that grant of power made to Congress under the Commerce Clause.  It is in no way a regulation of persons in interstate commerce but an exertion of a general police power through an illusory and impermissible jurisdictional nexus.  Thus, the Court declares that § 16913 is unconstitutional in that Congress lacks the power to enact the same under the Commerce Clause.  Because an unconstitutional law is no law at all, Defendant Edward Myers shall go hence without day.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** as follows:

1. The Court hereby declares 42 U.S.C. § 16913 and 18 U.S.C. § 2250 as unconstitutional for the reasons expressed above;

2. Defendant Edward Myers's Motion To Dismiss Indictment (DE 17) be and the same is hereby **GRANTED**; and

3. That Defendant Edward Myers be discharged to go hence without day for return and exonerated of bond, if any, as to the Indictment hereinabove specified.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida this __9th__ day of December, 2008.

WILLIAM J. ZLOCH
United States District Judge

Copies Furnished:
All Counsel of Record